**RAYBESTOS PRODUCTS COMPANY, a Delaware corporation, Plaintiff–Appellee, Cross–Appellant,**

v.

**Gilbert W. YOUNGER, an individual, and TransGo, a California corporation, Defendants–Appellants, Cross–Appellees.**

Nos. 94–2267, 94–2321.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1994.

Decided April 6, 1995.

**1236**

Donald E. Knebel, Barnes & Thornburg, Indianapolis, IN, Jeffrey D. Lewin, Candace M. Carroll (argued), Sullivan, Hill, Lewin & Markahm, San Diego, CA, Legrande L. Young, Shelton, CT, for Raybestos Products Co., a Delaware corp.

John R. Schaibley, III, Scott D. Himsel, Baker & Daniels, Indianapolis, IN, Lois D. Thompson (argued), David S. Lippman, Pros-kauer, Rose, Goetz & Mendelsohn, Los Ange-les, CA, for Gilbert W. Younger, an individu-al, Transgo, a Cal. corp.

Before BRIGHT,[*] BAUER and COFFEY, Circuit Judges.

BRIGHT, Circuit Judge.

## I. Introduction

In this defamation action, Raybestos Prod-ucts Company (Raybestos) brought suit against Gilbert W. Younger and TransGo, Inc. (TransGo), seeking damages for injuries suffered as a result of allegedly defamatory statements made about certain Raybestos products. Raybestos specifically alleged causes of action under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), the Indiana RICO statute, Ind.Code Ann. § 35–45–6–1 (West 1994), the Indiana Anti–Competitive Combi-nation Statute, Ind.Code Ann. § 24–1–4–1 (West 1994), as well as state common law claims for defamation, injurious falsehood,

---

[*] The Honorable Myron H. Bright, Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

intentional interference with business relations and unfair competition.

The jury awarded Raybestos $1,760,000 in compensatory damages on the Lanham Act, injurious falsehood and defamation claims; $240,000 on the Indiana RICO claim,[1] and $500,000 in punitive damages. The district court[2] entered judgment in these amounts, and pursuant to post-trial motions further awarded Raybestos $1,325,000 in attorney fees, $495,691 in prejudgment interest, $61,744 in costs, and post-judgment interest.

TransGo and Younger raise seven issues on appeal: (1) Raybestos' trial reference to TransGo's $5,000,000 litigation reserve so prejudiced the defendants that a mistrial should have been awarded; (2) the admission of Gilbert Younger's February 15, 1990 letter to Raybestos should not have been admitted into evidence in light of the restrictions of Fed.R.Evid. 408; (3) the trial court erred in permitting Raybestos' Indiana RICO claim to go to the jury because Raybestos presented no evidence of injury caused by the predicate act of "intimidation"; (4) the trial court erred in declining to reduce or set aside the jury's RICO damage award, as it bore no rational relation to any claimed damages; (5) TransGo's survey questionnaire constituted "absolutely privileged" trial preparation material and should not have been admitted into evidence for the purpose of proving defamation; (6) the district court's admission of evidence of pre-November 16, 1989 defamatory statements constituted reversible error because the relevant provisions of the Lanham Act, which became effective on that date, cannot be applied retroactively; and (7) the trial court abused its discretion in awarding Raybestos prejudgment interest because the jury had already had an opportunity to include interest in its compensatory damages award.

Raybestos cross-appeals claiming (1) that the jury's $240,000 RICO verdict should be made commensurate to the overall compensatory damages award of $2,000,000, or alternatively a new trial on damages should be awarded; and (2) the district court erred in dismissing Raybestos' claim under the Indiana Anti-Competitive Combination Statute. Except for setting aside the award of prejudgment interest, we affirm the judgment of the district court and reject plaintiff's cross-appeal.

## II. Background

Raybestos is a Delaware corporation with its principal place of business located in Indiana. Raybestos manufactures clutch plates installed in automobile transmissions by both original equipment manufacturers, such as Ford and General Motors (GM), and by aftermarket repair shops, like Aamco Transmissions. Among the clutch plates manufactured by Raybestos are two of the four clutch plates used in the Ford Automatic Overdrive (AOD) transmission[3] and all of the plates used in GM's Turbo Hydramatic 440 transmission (THM).

Gilbert Younger, a citizen of California, is the president and owner of TransGo, a California-based company, which serves mechanics who repair automobile transmissions. TransGo performs this function by selling valve body kits (Shift Kits), which provide the tools and instructions necessary to repair and prevent problems associated with automatic transmissions. TransGo also offers mechanics a twenty-four-hour "hotline," which provides emergency, informational assistance.

This controversy has its beginnings in December 1987, when Ford started to receive complaints about its "1–2 shift" in its AOD transmission. The problem manifested itself as an undesirable harsh shift from first to second gear. In response to these complaints, Ford sent out three technical bulletins in December 1987 and January 1988 to

---

1. These damages were automatically trebled under the statute to $720,000. *See* Ind.Code Ann. § 34-4-30.5-5(b)(1) (West 1994).

2. The Honorable S. Hugh Dillin, Senior Judge for the United States District Court for the Southern District of Indiana.

3. Raybestos does, however, supply all four clutch plates to repair shops in the aftermarket sector. The four clutch plates are the forward, reverse, intermediate and direct. The two plates which Ford puts into its AOD system are the intermediate and direct.

over 2500 dealerships, recommending that Raybestos' intermediate and direct clutch plates be replaced with clutch plates manufactured by Raybestos' competitor, Borg Warner. These bulletins were later reprinted in at least one of the leading transmission repair manuals. Raybestos also began to receive complaints, and by February 1988, Aamco Transmissions returned over 2500 Raybestos AOD intermediate clutch plates because of "field problems."

By the spring of 1988, TransGo and Younger had also become aware of compatibility problems with the Ford AOD transmission and Raybestos clutch plates. Motivated in part by the fear that his Shift Kits might be blamed for these problems, Younger decided, sometime prior to July 1988, to test the Raybestos intermediate AOD clutch plate. After completing the "tests," Younger wrote to Raybestos in early July 1988, demanding that Raybestos recall its AOD intermediate clutch plates, reimburse the transmission shops that had experienced problems with these plates, and reimburse TransGo for its work in defining the alleged "defect." The letter also requested that Raybestos employ Younger as a paid consultant and threatened Raybestos with adverse publicity if it did not positively "respond" to the terms of the letter by July 15. (Plaintiff's Exhibit 12).

After Raybestos failed to respond to the letter, Younger and TransGo began what Raybestos characterized as a deliberate campaign to publicize false statements about Raybestos products. The "campaign" began with Younger writing to his distributors and subscribers, notifying them that the Raybestos clutch plates were defective, asserting that Raybestos knew the plates were defective but refused to recall them, and suggest-

ing that the problem did not relate to TransGo's Shift Kits.

On August 10, 1988, Raybestos' general counsel warned Younger and TransGo that they had defamed Raybestos, that they were not qualified to assess the quality of Raybestos products, and that if they did not cease making defamatory statements and issue a retraction, Raybestos would initiate suit. Despite the warning, Younger and TransGo continued threatening to disparage Raybestos products and continued carrying out their threats. For example, TransGo and Younger published statements disparaging Raybestos clutch plates in their Shift Kit instructions, which they then circulated throughout the United States, Canada and Australia. Younger and TransGo had their "hotline" operators inform callers that Raybestos plates were defective and should not be used. And once Raybestos had brought suit, Younger and TransGo distributed questionnaires to over 18,000 transmission shops, suggesting that fourteen different Raybestos clutch plates were responsible for almost fifty different transmission problems.

Additionally, Younger and TransGo continued to seek financial rewards for their efforts, engaging in a pattern of threats and intimidation aimed at coercing monetary payments and other concessions from their competitors. For example, in February 1990, Younger sent Raybestos an unsolicited proposal, under a cover letter from Younger's attorney-son, offering the "resolution of potential litigation vs. Raybestos" if Raybestos paid Younger and TransGo $240,000, hired Younger to test clutch plates for $450 per hour, and paid him to prepare reports on clutch plates at an estimated $10,000–$12,000 per plate.[4] (Plaintiff's Exhibit 168). Raybestos responded by inviting Younger to

---

4. Younger and TransGo also wrote to the Automotive Transmission Rebuilders Association (ATRA) excoriating ATRA for refusing to "do its job" and for not telling its members that Raybestos plates were defective. Younger and TransGo additionally demanded that ATRA pay them $80,000 per year for undoing problems caused by mechanics' following ATRA technical advice, and threatened ATRA with suit if it did not comply. (Plaintiff's Exhibit 189).

Moreover, Younger wrote a letter to a competing valve body kit manufacturer, Superior Trans-

missions, giving Superior a week to pay Younger $265,000 or face an adverse publicity campaign like that carried out against Raybestos. When Superior refused, Younger mailed two letters to automatic transmission repair shops stating that Superior's valve body kits were defective and could cause severe damage to automobile transmissions. Superior Transmissions sued Younger and TransGo and won a $4,000,000 judgment that forced Younger to file for bankruptcy, causing a delay in the litigation of this case.

visit Raybestos' plant in Indiana so that Younger could see first-hand Raybestos' quality control procedures. Younger refused and cut off all communications.

Throughout this time, Raybestos had been performing several tests designed to identify any actual defects in its products. As part of this effort, Raybestos contacted Younger for specific data supporting Younger's complaints. Ultimately Raybestos concluded that no defect existed with the plates themselves, but that Ford's use of a new transmission fluid, calibration problems in the tools provided by TransGo's Shift Kits, or the manner in which mechanics installed the plates could explain the resulting poor friction ratios.[5] Ford, in fact, had continued to use Raybestos forward and reverse plates and continued to give Raybestos high quality ratings.

In November 1990, Raybestos filed this suit against Younger and TransGo, and after much delay, the case went to trial on January 31, 1994. The trial lasted for twelve days, after which the case went to the jury on the Lanham Act, defamation, injurious falsehood and RICO causes of action. The jury returned a verdict for Raybestos on all four claims, awarding total compensatory damages of $2,000,000, of which it attributed $240,000 to the RICO claim, and punitive damages of $500,000. The district court entered judgment in these amounts on February 15, 1994. On March 1, 1994, Raybestos filed motions to alter or amend the judgment or for a new trial on damages, and on March 2, Younger and TransGo filed a motion for judgment as a matter of law and for a new trial. At a hearing held April 11, 1994, the court denied Younger and TransGo's motions and awarded Raybestos attorneys fees, pre- and post-judgment interest, and costs. The court entered its amended judgment on April 28, 1994. This appeal followed.

## III. Discussion

### A. Mention of Litigation Reserve

During direct examination of Gilbert Younger, counsel for Raybestos asked a series of questions relating to Younger's and TransGo's net worth. As one of its questions, plaintiff's attorney asked: "TransGo has a litigation reserve or retained earnings of $5 million, does it not?" Before Younger had an opportunity to respond, his counsel immediately objected on the grounds of irrelevancy. The district court sustained the objection and told the jury to disregard it. Tr.Vol. III at 460. At a sidebar conference, the judge denied Younger's motion for a mistrial.

As its first issue raised on appeal, TransGo and Younger contend that Raybestos' trial reference to TransGo's $5,000,000 litigation reserve so prejudiced the defendants that a mistrial should have been awarded.

In reviewing a trial court's disposition of a mistrial motion, the proper standard is abuse of discretion. *United States v. Davis,* 15 F.3d 1393, 1399 (7th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 250, 130 L.Ed.2d 171 (1994).[6] "In deciding whether the court abused its discretion, we assume that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." *Wilson v. Groaning,* 25 F.3d 581, 587 (7th Cir.1994) (citation and internal quotations omitted). When the judge gives a curative instruction, this court must also "presume that the jury will follow an instruction to disregard inadmissible evidence unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating." *Id.* (citations and internal quotations omitted).

---

5. During the first week of trial, both sides agreed to test the clutch plates, but disagreed as to the results. Although Raybestos put the clutch plates in the test car and accompanied Younger as he test "drove" the car, Raybestos complained that Younger abused the transmission to the point of causing the car to overheat and the occupants to become sick. Apparently, the jury believed Raybestos and disbelieved Younger.

6. The district court's denial of a mistrial motion is a matter of federal procedure and is not governed by state law or practice. *Rosenburg v. Lincoln American Life Ins. Co.,* 883 F.2d 1328, 1333 (7th Cir.1989).

■ TransGo and Younger argue that mention of a litigation reserve is "even more prejudicial" than the mention of insurance, which, they claim, is "wholly prohibited," under Fed.R.Evid. 411. Rule 411 provides that "[e]vidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully." Appellants suggest that when someone has evaluated potential liability and has a reserve to respond to that liability, mention of that reserve is not merely improper, it also constitutes reversible error.

In *Adams Laboratories, Inc. v. Jacobs Engineering Co., Inc.*, 761 F.2d 1218 (7th Cir. 1985), this court established the test for determining when an insurance reference constitutes reversible error. The plaintiff in *Adams Laboratories, Inc.* had made available to the jury an unredacted copy of a disputed contract, which included several insurance coverage provisions. However, because the evidence had not sufficiently established that the plaintiff had acted in bad faith in submitting the insurance provisions to the jury, the court determined that introduction of the insurance provision, alone, did not constitute reversible error. *Id.* at 1227. The court held that "to constitute reversible error, references to insurance coverage must be 'due to some misconduct or improper remarks or questions of counsel, ofttimes repeated, and calculated to influence or prejudice the jury.'" *Id.* at 1226–27 (citation omitted). In other words, there must have been a prejudicial intent, as well as a prejudicial effect.

Because that court found insufficient evidence of prejudicial intent, it did not have to address the prejudicial effect that the insurance reference likely had on the jury. Presumably, the effect was substantial because the jury actually had a copy of the unredacted insurance references during their deliberations.

In the present case, however, the effect seems minimal: The question was immediately objected to; Younger never had an opportunity to respond; the judge did all he could to cure any prejudice; the question came at the very early parts of the trial; and counsel made no further reference to the litigation reserve.

Notwithstanding these mitigating factors, Younger and TransGo contend that because an insurance agent became the foreman of the jury we should assume that the litigation reserve reference affected the jury's deliberations in a substantial way.

Because of the deferential standard of review and action by the judge to avoid any prejudicial effect resulting from the "litigation reserve" comment, we decline to characterize the comment as prejudicial error requiring a new trial and consider appellants' "assumption" as speculation.[7]

### B. Admission of the February 15, 1990 "Settlement" Letter

■ On February 15, 1990, Gilbert Younger's attorney-son, Michael Younger, wrote to Raybestos with a plan that both Youngers contended would obviate the need for litigation. The purported settlement plan was outlined in a memorandum from Gilbert Younger to his son, Michael, which Michael enclosed in his letter to Raybestos. The memorandum proposed that Raybestos pay TransGo $240,000 for, among other things, research performed in identifying problems with Raybestos clutch plates and that Raybestos hire Gilbert Younger as a quality-control consultant. (Plaintiff's Exhibit 168). Raybestos characterized the letter and accompanying memorandum not as a settlement proposal, but rather as evidence of Younger and TransGo's continued effort to intimidate Raybestos and extort hundreds of thousands of dollars from it. On those grounds, and over Younger's objections, the district court admitted the letter and memorandum into evidence.[8]

---

**7.** We additionally note that courts have uniformly retreated from the "extreme position" of granting a mistrial whenever there is an erroneous disclosure of the existence of insurance. 23 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5369, at 478–79 (1980).

**8.** Younger had also sought a motion in limine to exclude its admission.

Appellants contend that the admission of this letter and memorandum violated Fed. R.Evid. 408. Rule 408 renders inadmissible evidence of statements made in compromise negotiations if offered as an admission of the validity or invalidity of the claim or its amount under negotiation. Raybestos offered the letter as evidence of "intimidation" pursuant to its Indiana RICO claim. Younger contends settlement negotiations had already begun. Therefore, Younger would have us reverse the district court's evidentiary ruling and order a new trial on the RICO claim.

We review the trial court's admission of evidence under the very deferential abuse of discretion standard, "inquiring not whether we would have ruled the same way but rather whether any reasonable person would have agreed with the trial court." *Holmes v. Elgin, Joliet & Eastern Ry. Co.*, 18 F.3d 1393, 1397 (7th Cir.1994); *see also Cook v. Navistar Int'l Transp. Corp.*, 940 F.2d 207, 212 (7th Cir.1991).[9] For Rule 408 to be applicable, defendants needed to make a "substantial showing" that the letter was, in fact, part of a settlement attempt. *See New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1482 (7th Cir.1990).

To determine whether Younger sent his letter as an attempt to compromise a claim, or rather to intimidate the plaintiff, this court must look at the totality of the circumstances, carefully reviewing the contents of the letter and the timing of its delivery. Upon review of the record and the atmosphere in which this letter was sent, we conclude that Younger volunteered this letter and that no settlement arrangements or discussion had been initiated by Raybestos against whom Younger was then making various defamation claims.

The letter was dated approximately eight months before Raybestos filed suit against Younger and TransGo. Therefore, even assuming Younger intended that the letter would avoid *potential* litigation, the timing as well as the contents of the letter strongly suggest that settlement "discussions," in any reasonable sense of the word, had not begun.

Granted, Raybestos had sent Younger its own letter in August 1988 threatening to sue if Younger did not "cease and desist" from further defaming and libeling its products and if Younger did not retract his earlier disparaging remarks. (Plaintiff's Exhibit 109). Younger, however, ignored that letter, continued a pattern of defamatory attacks for eighteen months, and never issued any retractions. It was not until February 1990 that Younger allegedly "responded" to Raybestos' offer, and his response belied even a basic understanding or acknowledgment of what Raybestos had written when it threatened to sue.

In sum, even considering the February 1990 letter as a response to Raybestos' August 1988 letter, the record fully supports the conclusion that the letter did not relate to any proposal for settlement. Thus, Fed. R.Evid. 408 did not bar the admission of the February 15th letter and the district court did not abuse its discretion in so admitting it.

## C. Submissibility of Indiana RICO Claim

█ Raybestos predicated its Indiana RICO claim on Gilbert Younger's alleged acts of "intimidation." According to Raybestos, Younger on several occasions attempted to condition the withholding of defamatory statements about Raybestos' products on Raybestos' paying Younger certain sums of money or hiring Younger as a consultant. The Indiana Code defines "intimidation" as "communicat[ing] a threat to another person, with the intent that: (1) the other person engage in conduct against his will." Ind. Code Ann. § 35–45–2–1 (West 1994). The Code also designates "intimidation" as a "racketeering activity." *Id.* § 35–45–6–1(22).

Those who participate in enterprises that engage in "racketeering activities" are not only subject to prosecution as class C felons, *id.* § 35–45–6–2, but may also be sued for treble damages by a person who has "suf-

---

**9.** With few exceptions, none of which apply here, the federal rules of evidence, and not state law, govern the admissibility of evidence within this circuit. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir.1993); *Rosenburg v. Lincoln American Life Ins. Co.*, 883 F.2d 1328, 1333 (7th Cir. 1989). *But cf.* Subsection E, *infra.*

fered damages or harm *as a result of*" these activities, *id.* §§ 34–4–30.5–1, –5(b) (emphasis added); *cf.* 18 U.S.C. § 1964(c) (federal RICO provision stipulating that "[a]ny person injured in his business or property *by reason of* a violation of section 1962 ... may sue ... [for] threefold the damages he sustains" (emphasis added)).

Assuming the existence of genuine issues of material fact that supported Raybestos' claims of a pattern of racketeering activity, and assuming the injury that Raybestos complained of *resulted* from such activity, the trial court would not have abused its discretion in submitting Raybestos' RICO claim to the jury. As its third claim on appeal, however, Younger contends that Raybestos presented no evidence of injury *caused* by the predicate act of "intimidation," and could not introduce such evidence because Raybestos had never given in to Younger's demands. Younger argues that Raybestos' alleged lost profits—the only claim of injury Raybestos raises—resulted not from "intimidation," but rather from Younger's allegedly defamatory and disparaging statements. Accordingly, Younger contends that Raybestos lacked standing to raise the Indiana RICO claim and that the district court erred in submitting that claim to the jury. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (noting that RICO plaintiff lacks standing if he was not injured by the conduct constituting the violation).[10]

As Younger unsuccessfully raised this claim in its renewed motion for judgment as a matter of law, we review the district court's denial of this motion as the Indiana courts would review a similar motion attacking the sufficiency of the evidence.[11]

In reviewing a trial court's ruling on a motion for judgment on the evidence, the appellate court must consider only the evidence and reasonable inferences most favorable to the non-moving party. If there is any probative evidence or reasonable inferences that would allow reasonable persons to differ, then judgment on the evidence is improper.

*Clark v. Wiegand,* 617 N.E.2d 916, 918 (Ind. 1993).

In its disposition of Younger's motion for judgment as a matter of law, the district court reasoned that "the fact that the plaintiff went ahead with its business and didn't just quit doesn't excuse Mr. Younger because he then, carrying out his threat, proceeded to run down the product of plaintiff in several different ways and certainly damaged the plaintiff." *Raybestos Products Co. v. Younger,* No. IP 90–2052–C, at 14 (D.Ind. April 11, 1994) (transcript of post-trial hearing). We agree.

To suggest that because Raybestos never acceded to Younger's demands Raybestos therefore cannot establish damages resulting from Younger's "intimidation" misconstrues the statutorily-defined predicate crime of "intimidation" and too narrowly construes RICO. As an initial matter, we note that acceding to the defendant's demands is not a requisite element of the predicate act of "intimidation." Instead, as the Indiana statute clearly indicates, only the defendant's intent that the plaintiff change his course of conduct is necessary to establish "intimidation." Because the plaintiff need not rely on the defendant's threats in order to establish a § 35–45–2–1 violation, the injury and damages resulting from such violations cannot logically be limited to "reliance damages." *Cf.* 86 C.J.S. *Threats & Unlawful Communications* § 3 at 792 (1955) ("Unless the statute so provides, the person threatened need not

---

10. Because of the dearth of case law interpreting the Indiana RICO statute, we turn for guidance to federal court interpretations of the federal RICO statute when the Indiana courts are silent as to a particular provision. Indiana patterned its RICO provisions after the federal RICO statute and for purposes of this appeal, the relevant provisions are substantially similar so that resort to federal court interpretations is appropriate.

*See Koger v. State,* 513 N.E.2d 1250, 1254–55 (Ind.Ct.App.1987).

11. Because "it is the source of the right sued upon ... which determines the governing law," we will determine sufficiency of the evidence under the Indiana law as this issue relates to the state RICO statute. *Colton v. Swain,* 527 F.2d 296, 300 (7th Cir.1975) (internal quotation and citation omitted).

actually have been put in fear, it being sufficient if the threat is of such character as might reasonably have that result.").[12] Therefore, evidence that Younger's "intimidation" or "pattern" of "intimidation" in some *other* way damaged Raybestos would suffice to establish a submissible case under the Indiana RICO statute.

■ To establish that a defendant's racketeering activities damaged or injured a civil plaintiff, the plaintiff must demonstrate that the defendant's actions "proximately caused" the injury. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–70, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992); *Mendelovitz v. Vosicky*, 40 F.3d 182, 184 (7th Cir.1994). "Proximate cause" exists when there is "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268, 112 S.Ct. at 1318. How "direct," of course, cannot be reduced to a single, uniformly applicable equation. Instead, notions of justice and policy often dictate the boundaries of "proximate causation."[13] *Id.; Schiffels v. Kemper Financial Services, Inc.*, 978 F.2d 344, 350 (7th Cir.1992); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990) (citations omitted).

In this case, however, we need not resort to policy arguments, as such, in order to establish a nexus between Younger's acts of "intimidation" and the lost profits that Raybestos asserted. Here, Younger's threats to defame Raybestos' products were part and parcel of a continued course-of-conduct, which included Younger's carrying out his threats to destroy Raybestos' reputation. Younger's attempt to isolate his defamatory communications as the only cause of Raybestos' damages belies the factual record, as well as common sense.

While the threat of spreading bad publicity, standing alone, would suffice to establish the predicate act of "intimidation," the magnitude and degree of Younger's intimidation, and therefore the probable effect that that intimidation had on Raybestos, depended on the *seriousness* of the threat. *Cf.* 86 C.J.S. *Threats and Unlawful Communications* § 4 at 794 (although the defendant's threats need not, in fact, intimidate the plaintiff, "the threats must be such as are calculated to intimidate or put in fear an ordinarily firm and prudent man"). The seriousness of the threat, in turn, depended on whether Younger would act upon his threats. That Younger did act upon his threats in waging an eighteen-month campaign against Raybestos increased the impact and effectiveness of each successive act of intimidation. Thus, whether Raybestos' lost profits stemmed directly from the effect of Younger's intimidation ("reliance damages") or from the form and nature of the "intimidation" itself, Raybestos still sustained some injury "as a result of" or "by reason of" Younger's racketeering activities. Younger's attempts to show otherwise are not convincing.

### D. Reasonableness of the RICO Damages Verdict

■ Younger additionally challenges the $240,000 RICO damage award. Younger would have this court either set-aside the award or at least reduce it to nominal damages. Younger principally argues that the award was not based on any actual damages suffered by Raybestos, but rather on the amount of compensation requested by Younger in his February 15, 1990 letter to Raybestos. In that letter, Younger asked Raybestos for $200,000 to compensate Trans-Go for tests it had performed on Raybestos clutch plates, plus an additional $40,000 for (among other things) information regarding

---

12. A plaintiff's reliance on the threat or intimidation is, of course, relevant to establishing the intent of the defendant. As held in *Hyde v. State*, 531 N.E.2d 472, 473 (Ind.1988), "[e]stablishment of the intent to cause an individual to engage in conduct depends on the facts and circumstances surrounding the offense."

13. In the context of RICO, the courts have consistently recognized that Congress intended RICO to be interpreted broadly so as to facilitate

criminal prosecutions and civil actions. *See, e.g., Sedima*, 473 U.S. at 497–98, 105 S.Ct. at 3285–86 (noting that "RICO is to be liberally construed to effectuate its remedial purpose"); *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 399 (7th Cir.1984) (noting that RICO is "above all, deliberately and extraordinarily broad"), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

the clutch plate market, help with Raybestos' "philosophical business foundation," and current clutch plate data. Because Raybestos never paid $240,000 to the defendants, Younger contends that the damage award is excessive and unsupported by the evidence.[14]

Following a post-trial hearing, the district court affirmed the jury's RICO damage award and denied Younger's motion to reduce or set-aside the award. The court noted that while the $240,000 resembled the amount Younger had demanded of Raybestos in his February 15, 1990 letter, it would not attempt to "psychoanalyze the jury." *Raybestos Products Co. v. Younger*, No. IP 90–2052–C, at 16 (D.Ind. April 11, 1994) (transcript of post-trial hearing).

■ Federal law governs the district court's review of a jury award and appellate review of the district court's decision. *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1189 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993); *Matter of Innovative Const. Systems, Inc.*, 793 F.2d 875, 887 (7th Cir.1986). We review the district court's decision not to set-aside or reduce the RICO damage award under the "extremely limited abuse of discretion standard." *Frazier v. Norfolk & Western Ry. Co.*, 996 F.2d 922, 925 (7th Cir.1993).

To disturb a jury award, it must be shown that the award is "monstrously excessive, a product of passion and prejudice, or ... there is no rational connection between it and the evidence." *Id.* at 887 (collecting cases); *see also Holmes v. Elgin, Joliet & Eastern Ry. Co.*, 18 F.3d 1393, 1395–96 (7th Cir.1994) (same test); *Superbird Farms, Inc. v. Perdue Farms, Inc.*, 970 F.2d 238, 247 (7th Cir.1992) (noting that the Indiana standard is "quite similar"); *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir. 1983) (same). Younger principally focuses on the third prong of the test, suggesting that

the $240,000 award bears no resemblance to any losses incurred by Raybestos.

Although the jury awarded damages in the amount of $240,000 on the Indiana RICO claim, Raybestos had alleged and provided evidence in support of damages totalling approximately $5,000,000 in lost profits. Indeed, Raybestos' cross-appeal contends that it is entitled to an additur to equalize the RICO award to the overall compensatory damages award of $2,000,000.[15] In sum, the award of $240,000 on the RICO claim was certainly not facially unreasonable. *Cf. Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554–55 (7th Cir.1990) (noting that it is "rare" for an appellate court to "determine that the damages awarded have no rational connection to the evidence presented," but holding that this was one of those rare cases because the jury left "Pincus in a dramatically better position than his rational expectation could have justified").

While Younger believed the RICO award was too much, Raybestos in its cross-appeal contended it was too little. Raybestos had proceeded on a single damage theory of lost profits resulting from either one or all of its four causes of action. Presumably, then, damages under any one cause of action would necessarily be commensurate to damages under any of the other three. They were not. As has been noted, the jury awarded $1,760,000 in compensatory damages under the Lanham Act, injurious falsehood and defamation claims, but only $240,000 in RICO damages.

A reasonable explanation for this disparity could be that while both TransGo and Younger were named as defendants to the Lanham Act, defamation, and injurious falsehood claims, only Younger was named a defendant to the Indiana RICO claim. Additionally, the instructions submitted to the jury required it to allocate a percentage of the overall compensatory damages award to the RICO

---

**14.** Younger also argues that the award should be vacated because Raybestos could not have suffered any actual damages due to this demand. We have already rejected, however, Younger's contention that Raybestos must have succumbed to Younger's extortionary demands in order for Raybestos to suffer RICO damages. *See* Subsec-

tion C, *supra*. Therefore, we will not revisit this aspect of Younger's argument.

**15.** In other words, instead of a RICO award of $240,000 (trebled at $720,000), Raybestos asks that we increase its RICO award to $2,000,000 (trebled to $6,000,000).

claim. No party objected to these instructions.

Upon all the evidence and the instructions, we cannot characterize the amount or allocation as unreasonable. Accordingly, we affirm the RICO award.

### E. Admission of the Survey Questionnaire

■ On December 3, 1990, a month after Raybestos filed suit, Younger and TransGo sent their distributors a letter charging Raybestos with a "lack of technical competence and virtue" and a questionnaire suggesting that fourteen different Raybestos clutch plates were responsible for almost fifty different transmission problems. (Plaintiff's Exhibit 354). Soon thereafter, defendants mailed a similar questionnaire to 18,-000 transmission shops around the country. (Plaintiff's Exhibit 235). Despite the defendants' objections, the district court admitted the cover letter and questionnaire into evidence.

On appeal, TransGo and Younger claim that the district court's admission of these exhibits constituted reversible error. Citing § 587 of the Restatement (Second) of Torts, appellants contend that the questionnaire was "absolutely privileged" trial preparation material and should not have been used against them in establishing Raybestos' claim of common law defamation.[16]

■ In reviewing the district court's admission of allegedly privileged evidence, we apply the deferential abuse of discretion standard. See Holmes v. Elgin, Joliet & Eastern Ry. Co., 18 F.3d 1393, 1397 (7th Cir.1994); Jackson v. State, 597 N.E.2d 950, 963 (Ind.1992); Averhart v. State, 470 N.E.2d 666, 686 (Ind.1984) (subsequent history omitted). According to Fed.R.Evid. 501, however, federal courts overseeing civil cases are required to determine the existence of a privilege in accordance with *state law* if the privilege supplies the rule of decision with

regard to an element of a defense. *Id.; see also Desai v. Hersh,* 954 F.2d 1408, 1411 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 190, 121 L.Ed.2d 133 (1992). Because Younger and TransGo have invoked the "absolute privilege" of publishing defamatory material as a partial defense against Raybestos' defamation claim, Indiana law guides our analysis.

■ Notwithstanding Younger and TransGo's claims to the contrary, Indiana law does not afford them an "absolute privilege." As summarized recently by one intermediate appellate state court, "Indiana law [does] afford an absolute privilege to statements made in the course of a judicial proceeding." *Chrysler Motors Corp. v. Graham,* 631 N.E.2d 7, 9 (Ind.Ct.App.1994). But the Indiana courts have never extended this privilege, as § 587 of the Restatements does, to statements made *prior* to a judicial proceeding or, as in this case, to trial preparation material.

We additionally note that this court has consistently construed federal and state privilege laws narrowly, giving effect to federal evidentiary requirements that are designed to include, not exclude, probative evidence. *See Desai,* 954 F.2d at 1411 (citing *University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990)); *E.E.O.C. v. University of Notre Dame Du Lac,* 715 F.2d 331, 335 (7th Cir. 1983); *In re Pebsworth,* 705 F.2d 261, 264 (7th Cir.1983) (Gray, J., Senior District Judge, concurring); *Ryan v. C.I.R.,* 568 F.2d 531, 543 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). As further explained by this court in *Ryan:*

> [R]ecognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis. In making the case-by-case determination, it is helpful to weigh the need for truth against the importance of the relationship or policy sought to be

---

**16.** Section 587 provides that:

A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Restatement (Second) of Torts § 587 (1977).

furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case.

*Id.* (internal quotations and citations omitted).

In light of the factual setting of this case, we do not believe extension of the privilege would further anything but the interests of those who wish to use the immunity defense as a "cloak" for continued defamation. *Cf.* Restatement (Second) of Torts § 587 cmt. e (1977). Accordingly, we hold that the district court did not abuse its discretion in admitting TransGo and Younger's questionnaire and accompanying letter.

### F. Retroactivity of the Lanham Act

■ Younger and TransGo next contend that the trial court erred in admitting evidence of defamatory statements made before November 16, 1989 because the relevant provisions of the Lanham Act, which became effective on that date, cannot be applied retroactively.[17] As amended, the Lanham Act holds liable any person who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her *or another person's goods,* services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B) (emphasis added). Before November 16, 1989, the Lanham Act never explicitly applied to "another person's goods," and was actually construed by the courts as *not* proscribing misleading or disparaging statements about another's products. *See, e.g., Bernard Food Industries, Inc. v. Dietene Co.,* 415 F.2d 1279, 1283 (7th Cir.1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970). Therefore, until November 16, 1989, Raybestos had no cause of action under the Lanham Act to sue Younger and TransGo for their misrepresentations of Raybestos clutch plates.

Contending that Raybestos' most significant evidence of misrepresentation and defamation occurred *before* November 16, 1989, Younger and TransGo argue that but for the admission of this evidence, the jury would

not have rendered a verdict against them on Raybestos' Lanham Act claim. Our review of the record indicates, however, that after November 16, 1989, Younger and TransGo placed tens of thousand of defamatory inserts into their Shift Kits, continued to disparage Raybestos products over their "hotline," and mailed 18,000 questionnaires to transmission shops nationwide, suggesting problems with several Raybestos products. Additionally, all of these activities occurred within the context of "commercial advertising or promotion." Even the defendants' questionnaires, supposedly distributed to build a case against Raybestos, offered free TransGo products if the surveys were completed and returned.

The record indicates that the admission of pre-November 16th evidence could not have prejudiced the defendant in light of the wealth of post-November 16th evidence. Thus, regardless of whether the district court erred in applying the Lanham Act to *all* of the appellants' defamatory actions, it was "harmless error." *Jackson v. Bunge Corp.,* 40 F.3d 239, 244 (7th Cir.1994).

### G. Award of Prejudgment Interest

■ By post-trial motion, Raybestos sought and was awarded $495,695 in prejudgment interest on its $2,000,000 compensatory damages verdict. As its final claim on appeal, Younger contests the award of prejudgment interest, raising several grounds for reversal, of which only one concerns us here. According to Younger, because Raybestos presented damage figures to the jury calculated both with and without interest, the jury's compensatory damage award may have included interest. In other words, we cannot know whether the jury's $2,000,000 award actually included interest. Therefore, fairness dictates that Raybestos, not Younger, shoulders the consequences of this confusion and uncertainty. The district court rejected this argument without discussion and entered its amended judgment awarding prejudgment interest.

---

17. The defendants raised this issue with the trial court in their trial brief. Defendants' Trial Br. at 30–32, Docket No. 710.

■ Regardless of whether we apply Indiana law or federal law in reviewing the district court's amended judgment, the decisional rules as to prejudgment interest share a common purpose that applied to the particular claim at issue here resolves the controversy. That purpose or principle requires that prejudgment interest serve to fully compensate the injured, but not to penalize the party causing injury. *See* Lanham Act, 15 U.S.C. § 1117(a) (providing that courts have discretion to enter such "sum[s] as the court shall find to be just. . . . [and] shall constitute compensation and not a penalty"); *Fortino v. Quasar Co.*, 950 F.2d 389, 397–98 (7th Cir. 1991) (noting that prejudgment interest on "doubled damages" is not compensatory, but rather punitive, and thus should not be awarded); *Harlan Sprague Dawley, Inc. v. S.E. Lab Group, Inc.*, 644 N.E.2d 615, 619 (Ind.Ct.App.1994) (noting that the purpose of prejudgment interest is full compensation); *Fort Wayne Nat. Bank v. Scher*, 419 N.E.2d 1308, 1310–11 (Ind.Ct.App.1981) (noting that "interest is recoverable not as interest but as additional damages to accomplish full compensation").

Plaintiff cannot recover prejudgment interest twice. Because Raybestos provided the jury with damage figures that included interest estimates, we will presume that the jury's award included an interest augmentation.[18] Accordingly, the subsequent award of prejudgment interest constituted an unauthorized doubling of damages and thus the district court's amended judgment as to the prejudgment interest must be vacated.

#### H. Raybestos' Cross–Appeal Claims

Raybestos raises two cross-appeal claims. First, Raybestos contends that the jury's

RICO damage award bears no rational relationship to Raybestos' actual RICO injuries, thus meriting an additur or alternatively a new trial on RICO damages. Second, Raybestos contends that the district court erred in dismissing Raybestos' claim under the Indiana Anti–Competitive Combination Statute.

As to Raybestos' first cross-appeal claim, we have already determined that the evidence sufficiently supported the jury's RICO award, regardless of whether one argues it over or under compensated the plaintiff. *See* Subsection D, *supra*. As for Raybestos' second cross-appeal claim, we need not address it. In its appellate brief, Raybestos asked this court to consider its Anti–Competitive Combination claim only if we reversed the jury's compensatory damages award. (Appellee's Br. at 49). Because we have elected not to disturb that award, our inquiry necessarily ends.

#### IV. Conclusion

For the reasons presented above, we affirm the district court on all claims and cross-claims, excepting the district court's prejudgment interest award, which we vacate.

So ORDERED.

---

18. Adopting this presumption in no way conflicts with this circuit's well-established principle that prejudgment interest is presumptively available to victims of federal law violations. *See Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir.1989). In *Gorenstein*, this court imbued equitable principles into the prejudgment interest calculus, reasoning that an award of prejudgment interest would be even more justified when the defendants acted in bad faith. *Id.; see also* Lanham Act, 15 U.S.C. § 1117(a) (noting that courts shall assess damages "subject to the principles of equity"). The plaintiff's submission of damages did contribute to the confusion and uncertainty surrounding the award of interest as part of compensatory damages. In balancing equities, we believe that the plaintiff should not benefit from the confusion arising from its damages submission.

Additionally, we note that adopting this presumption also comports with Indiana law relating to non-federal damages, which provides that the party seeking an award of prejudgment interest has the burden of proof. *Harlan Sprague Dawley, Inc.*, 644 N.E.2d at 618 n. 3.