**UNITED STATES of America,
Plaintiff,**

v.

**MIRAMA ENTERPRISES, INC., a California Corporation, d/b/a Aroma Housewares Co., Defendant.**

No. 00CV2269–K(LAB).

United States District Court,
S.D. California.

Feb. 12, 2002.

Patrick Jasperse, U.S. Dept. of Justice, Office of Consumer Lit., Washington, DC, for plaintiff.

Jeffrey B. Margulies, Parker, Milliken, Clark, O'Hara & Samuelian, Los Angeles, CA, for defendant.

AMENDED ORDER GRANTING
PLAINTIFF'S MOTION FOR
SUMMARY JUDGEMENT

KEEP, District Judge.

On November 30, 2001, Plaintiff filed the instant motion for summary judgement; Defendant opposes. Both sides are proceeding through counsel. Oral argument, limited to the issue of whether the government need furnish expert testimony to support its motion, was heard on January 22, 2002.

## I. Background

This is not your usual summary judgement motion: aside from evidentiary objections, the relevant material facts are clear and uncontested. Plaintiff's complaint seeks civil damages for Defendant's failure to notify the Consumer Product Safety Commission ("Commission") about alleged defects or the alleged danger posed by Defendant's consumer product. Plaintiff's instant motion seeks summary judgement on Defendant's liability for failing to properly notify the Commission once Defendant had notice of the defects and/or dangers posed by its product. The essential question is whether Defendant had notice of the problems with its product, such that it was required to notify the Commission. Defendant interposed evidentiary objections to many of the factual allegations made by Plaintiff. Those evidentiary objections are addressed in the analysis following this factual summary. Where Defendant's evidentiary objections were sustained, those factual allegations are not contained in the factual summary below.

### A. Aroma Housewares Co. and the Juicer

The Defendant, Mirama Enterprises, Inc., d/b/a Aroma Housewares Co. ("Aroma"), is a California corporation, located in

San Diego, California, that began doing business in February 1996. Defendant's Statement of Facts ("DSOF") at 2.[1] Aroma distributes a variety of electric kitchen appliances that it imports from China and Taiwan to retailers in the United States and abroad. *Id.* From February or March 1996 until February or March 1998, Aroma distributed in the United States a juice extractor, model ACJ–250 ("juicer"), which extracts the juice from fruits and vegetables. Aroma distributed the juicer to a variety of retail outlets. *Id.*

The juicer was manufactured in China by Semco, which is headquartered in Taiwan. *Id.* at 3. The juicer contains several parts: the base, the upper housing, containers for juice and pulp, the grater/filter, the cover/chute, and the plunger. The separate plastic plunger pushes fruit and vegetables down through the chute onto the rotating grater/filter, which is a flat metal plate with sharp metal teeth. The produce is pulverized, sending juice into one container and pulp into the other. *Id.* The packet of instructions included with the juicer instructed consumers to "3. Remove all pits (peaches, plums, etc.), large seeds (melons, etc.), and stems before placing food in Chute. Items such as these may damage the unit." *Id.* Consumers were also told: "Do not clean any part of the Juice Extractor with an abrasive cleaner. Do not put any part of the Juice Extractor in dishwasher or boiling water." *Id.* at 3–4.

## B. Initial Complaints and Aroma's Testing in January 1998

In early January 1998, Aroma received at least one complaint from a consumer whose juicer had broken. Aroma did not create or has not preserved any record of this initial consumer complaint. *Id.* at 4. In response to the initial consumer complaint(s), Aroma employee Fred Ying tested several juicers on January 12, 1998. *Id.* Mr. Ying tested six juicers for more than four hours. *Id.* When applying extra force on the plunger, the plunger was scratched by the grater/filter, but the grater/filter did not break and the lid remained intact. *Id.* For two juicers, an abnormally high pressure load of 145 pounds was placed on the plunger. The plungers were scratched and the juicers' blades broke, but the lids of the juicers remained intact and the broken blade was contained inside the juicer. *Id.* at 4–5. Another employee conducted a single test of a single juicer, by standing on the plunger. The juicer's blade came in contact with the base and the juicer stopped running, but did not shatter. *Id.* at 5. "Aroma was unable to reach any conclusions regarding the failure incidents at the time, other than to speculate that, perhaps, consumers were disregarding clear directions not to wash their juicers in hot water or a dishwasher, and compromising the integrity of the product." Defendant's Opposition at 4.

## C. Aroma's Awareness of the Juicer's Hazards Prior to November 16, 1998 [2]

1. In Defendant's Statement of Facts, Aroma set forth each factual allegation by Plaintiff, and either admitted, disputed, and/or interposed an evidentiary objection to the factual allegation. This laudable briefing technique served to sharply define the factual contentions and evidentiary objections at issue. For easy identification of those factual allegations in contention and for ease of citation, where Defendant admits the factual allegation by Plaintiff, the Court simply cites to Defendant's Statement of Facts. Where Plaintiff's factual allegation is disputed, or where Plaintiff interposes an evidentiary objection that was not sustained, the Court cites to the appropriate evidentiary exhibit.

2. Aroma notified the Commission of problems with the juicer on November 16, 1998. Thus, only those facts which are relevant to Aroma's

In early January 1998, Aroma received the initial (unrecorded) complaint(s) which triggered its testing of the juicer, as discussed above. On or about February 2, 1998, consumer Richard Norton called Aroma to report that his juicer had shattered. Gov. Ex. 2F at ¶ 6. Failing to receive any communications from Aroma, Mr. Norton followed up with a letter in capitalized letters that stated that the juicer

SUDDENLY EXPLODED, THROWING WITH GREAT VIOLENCE PIECES OF THE CLEAR PLASTIC COVER AND SHREDS OF THE RAZOR-SHARP SEPARATOR SCREEN AS FAR AS EIGHT FEET IN MY KITCHEN. NEEDLESS TO SAY, BUT I WILL, THE SUDDENNESS AND VIOLENCE OF THE EXPLOSION SHATTERED THE PEACE OF MY HOME AND FRIGHTENED ME GREATLY.

Gov. Ex. 2A.

On February 16, consumer Lihong Wang called Aroma to report that her juicer had shattered. Gov. Ex. 3C at ¶ 6. When the juicer shattered, a broken piece of plastic cut Ms. Wang's arm and sprayed apple pulp all over Ms. Wang and her kitchen. *Id.* at ¶¶ 3–5. Ms. Wang followed up with a letter one week later which went into detail on the incident, stating that "I was only fortunate that the broken metal grater and broken pieces did not hurt my eyes and cut me seriously." Gov. Ex. 3A.

In late February or early March, the daughter of consumer Frank Peel called Aroma to report that her elderly father was injured by the juicer. She reported that the blade of the juicer penetrated the plastic top of the juicer and cut her father's palm, requiring 16 stitches from the hospital emergency room. Gov. Ex. 4C.

In early March, the husband of consumer Tina Foster called Aroma to report that the juicer had shattered, cutting his wife's chin. Gov. Ex. 5E. In mid-April 1998, Aroma received a phone call from either consumer Savely Savva or his wife, reporting that their juicer had shattered. Gov. Ex. 6H.

On April 25, 1998, Aroma received a letter from consumer Zanita Bowlin, which stated that she and her mother were using the juicer

when a terrible explosion occurred. Shards of hard plastic and pieces of the metal blade went flying towards us. I was struck on the right hand and left forearm, my mother was hit in the right shoulder. Luckily, we were not hit in the face. I am an operating nurse by trade. The force from which these pieces of debris went flying was enough to have caused some serious injuries.

Gov. Ex. 7A.

On or about May 22, consumer Jan Griffin called Aroma and reported that her juicer had "exploded" and that she felt that the product was unsafe. Gov. Ex. 8L at 46–47. The Aroma representative told Ms. Griffin that "The only way that this type of explosion would happen is if you were using it incorrectly." *Id.* at 47. Responding to Aroma's questions, Ms. Griffin affirmed that she did not overload the juicer with too much fruit and that she cleaned the juicer after each use. The Aroma representative replied that "Well[,] I would just have to say it is your fault. Our juicer is built to withstand many hours of use." *Id.* On June 8, Ms. Griffin wrote to Aroma. She stated that "the machine exploded like a bomb. Bits and pieces of the plastic top & the stainless steel blade flew all over my kitchen, dining room, living room & utility room. My right hand

state of mind or notice received prior to that date are relevant to this motion.

& wrist was [sic] cut." Gov. Ex. 8A. She concluded that "I feel that this juicer should be recalled, as it is very unsafe. The injuries that I suffered could have been a lot worse.... This juicer should never have been allowed on the market!" *Id.*

On August 18, 1998, Aroma was served with consumer Sylvia Mendoza's lawsuit against Aroma and Rite Aid, which stated that the juicer had injured Ms. Mendoza. DSOF at 13. On September 21, 1998, counsel for Aroma took Ms. Mendoza's deposition. Ms. Mendoza gave detailed testimony about how her juicer shattered and caused injuries that necessitated her to be taken by ambulance to the hospital, required an overnight hospital stay, and caused permanent damage to her fingers, hand, and arm. *Id.* at 14. She testified that the juicer cut nine of her arteries. *Id.* at 15. She further testified about her continuing medical difficulties: "[i]n the mornings I have to put my hand under warm water because all my fingers are just totally stiff. They [sic] can't even move them. I have a lot of swelling on my hands still .... I still got a lot of pain." *Id.*

There were numerous other phone calls, letters, and other communications from various consumers to Aroma, detailing more exploding juicers and various injuries. From September 21 until November 16, 1998, Aroma received at least five phone calls directly from consumers reporting that their juicers had exploded. DSOF at 15–17. In total, prior to November 16, 1998, Aroma was informed of 23 incidents of the juicer shattering. *Id.* at 18. Of those 23 incidents, Aroma was

aware that 19 resulted in injuries to at least 22 people. *Id.* Of the 23 incidents, Aroma was informed that at least 7 of them resulted in medical treatment. *Id.* Aroma knew that five required stitches, and one required surgery. *Id.* Aroma recovered from consumers at least ten broken juicers. *Id.* at 19.

Aroma first filed a preliminary report with the Commission on November 16, 1998. Gov. Ex. 60B. The Commission received the company's final report in February 1999 and recalled the Aroma juicer on June 30, 1999. Gov. Ex. 60D; Gov. Ex. 52C.

## D. The Issue of Consumer Misuse

No consumer has indicated that the juicer was cleaned in an automatic dishwasher (which would be in contravention of the explicit instructions sold with the machine). DSOF at 19–20. Under penalty of perjury, more than a dozen consumers have testified that they did not clean the juicer in an automatic dishwasher. *Id.* Several consumers did not even have an automatic dishwasher. *Id.* In at least two instances, the juicer shattered the first time the consumer tried to use it. *Id.* at 19–20.

Aroma contends that this is simply evidence that no consumer has admitted to cleaning the juicer in the dishwasher. *Id.* at 19.[3] In support of its contention that product misuse can be inferred from the shattering, Defendant provides two letters from the Commission to Krups, Inc. in regards to injuries from a juicer made by Krups. These letters detail the manner in which the use of an automatic dishwasher

---

**3.** In oral argument, defense counsel referenced two depositions of consumers who had initially claimed not to have misused the juicer, but later admitted to applying undue pressure on the plunger or to using fruits containing pits or seeds. Counsel did not cite the depositions on which he relied in oral argument and he made no mention of this evidence in his moving papers. The Court therefore does not include these factual allegations in its opinion.

will weaken the plastic shell of the juicer and thus lead to shattering. *See* Def. Ex. 9, Def. Ex. 10.[4]

### E. The Complaints, the Commission, and Aroma

One of Aroma's points in opposition to Plaintiff's motion for summary judgement is that the Commission was already aware of the incidents with the Aroma juicer, and thus, pursuant to the statute, Aroma did not have a duty to report. Of the 23 consumers who notified Aroma of their juicers shattering, seven also contacted the Commission—one in March, one in May, one in June, and four in September and October. *See* Gov. Ex. 1B. Aroma first learned that consumers had also contacted the Commission on June 8, 1998, when the Commission informed Aroma regarding the incident with Tina Foster (cut chin). DSOF at 22.

Additionally, Aroma has provided extensive evidence that the Commission was aware of problems with juicers made by other companies. For example, in 1993 the Commission recalled one type of juicer and made a preliminary determination that another presented a substantial hazard. DSOF at 24. In 1994 the Commission sent the previously cited letters to Krups, stating that machine dishwashing weakened the plastic shell of the juicer, dishwashing by consumers was foreseeable, and warnings were not sufficient to prevent problems. *Id.* at 24–25. From 1995 to 1997, the Commission recalled juicers from four different manufacturers. *Id.*

### II. Summary Judgement Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The movant has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden then shifts to the nonmovant to show that summary judgment is not appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To make such a showing, the nonmovant must go beyond the pleadings to designate *specific facts* showing that there is a genuine issue for trial. *See id.* In considering this motion, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably find* for the [non-moving party]." *Id.* at 252, 106 S.Ct. 2505 (emphasis added).

### III. Aroma's Evidentiary Objections

■ With limited exceptions, the facts relied upon in a motion for summary judgement must be admissible under the Federal Rules of Evidence (FRE). *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 (9th Cir. 1989). The Court therefore rules on Aroma's evidentiary objections prior to reach-

---

4. Interestingly, both letters cited by Defendant warn of the hazards of a product that can easily be machine washed by consumers, but cannot withstand the rigors of dishwashing. For example, one letter states "It should be noted that dishwasher use with the components of this juice extractor is foreseeable.... Simply providing information as a warning or instruction is known to be of highly variable, and usually limited, effectiveness." *See, e.g.,* Def. Ex. 9.

ing the government's motion for summary judgement. Admission and exclusion of evidence is left to the sound discretion of the trial court. *Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1241 (7th Cir.1995). The background information already set forth above, upon which the Court bases its opinion, contains only evidence that the Court has deemed admissible.

### A. Relevance (FRE 401)

Aroma objects to a variety of evidence that: (i) pertains to incidents *after* November 16, 1998, the date Aroma reported to the Commission; or (ii) was not received by Aroma. Such evidence, Aroma argues, cannot be relevant to Aroma's state of mind or notice received prior to the date of reporting. The Court did not find it necessary to rely on any of the objected evidence and did not include such facts in its opinion. The Court therefore declines to reach Aroma's relevance objection.

### B. Redesign of Juicers (FRE 407)

■ Aroma objects to the government's reference to Aroma's redesign of its juicers following the receipt of consumer complaints. FRE 407 prohibits the admission of evidence of redesign to prove *inter alia* a defect in a product, its design, or its instructions. The Court sustains Aroma's objection to any evidence of redesign of its juicers. However, what is good for the goose is good for the gander. The Court has also refused to consider evidence of redesign submitted by Aroma to the Court in Defendant's opposition papers.

### C. Offers to Compromise and Settlements (FRE 408)

■ Aroma objects to 30 government exhibits pursuant to FRE 408. Rule 408 provides that:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

The 30 exhibits generally fall into two categories: (i) initial communications, either by letter or telephone, from consumers to Aroma; and (ii) follow-up communications from either Aroma or consumers once each side had communicated at least once. The Court denies Aroma's objection as to virtually all of the initial communications. As the Court found the follow-up communications to be unnecessary to resolution of the instant motion, the Court does not cite or rely upon such communications; the Court therefore finds it unnecessary to rule upon that evidentiary objection.

■ In order for the evidence of initial communications to be inadmissible under FRE 408, the communications must include reference to "valuable consideration", and there must be a disputed "claim" already existent. For FRE 408 to apply, Aroma must make a "substantial showing" that the communications "[were], in fact, part of a settlement attempt." *Raybestos Products Co.*, 54 F.3d at 1241 (internal citations and quotation marks omitted). Aroma has not made such a substantial showing and its objection is denied on two independent grounds. First, in the initial phone calls and letters from the consumers to Aroma, the consumers reported the incidents. Some demanded refunds on their juicers, and a few demanded additional money. None of the initial communications relied upon by the Court contained reference to valuable consideration or threatened litigation. The consumers were not asserting a legal claim and there was not yet a legal claim disput-

ed as to validity or amount. Thus, Rule 408 does not pertain.

■ Second, the communications are being introduced by the government to show notice to Aroma, not to prove the amount or validity of the consumer's claim. Thus Rule 408 does not apply. *See* WAGNER, FEDERAL RULES OF EVIDENCE CASE LAW COMMENTARY at 498 (2000–2001 ed.) ("Rule 408 is concerned with excluding proof of compromise to show the liability of the offeror, not to show the offer was made or that an event occurred"); *see also United States v. Austin,* 54 F.3d 394 (7th Cir.1995) (prior settlement with FTC allowed to show notice), *Thomas v. Resort Health Related Facility,* 539 F.Supp. 630, 638 (E.D.N.Y.1982).

### D. Declaration of Stephen Carlson (FRE 801)

Aroma objects to the Declaration of Stephen Carlson as inadmissible hearsay pursuant to FRE 801. As the Court has not relied upon or cited to the Declaration, the Court declines to rule on the objection.

### E. Consumer Correspondence as Hearsay (FRE 801)

■ Aroma objects to the introduction of written correspondence from consumers to Aroma as hearsay if admitted to prove the truth of the matters asserted in the writings, e.g. that the juicer actually shattered or the consumer was actually injured. Aroma concedes that the consumer correspondence is admissible to show notice to Aroma. The Court upholds Aroma's objection and where the Court has relied upon consumer correspondence, it has been admitted to show notice to Aroma and not for the truth of the matter asserted in the writings.

### F. Lay Witness Opinion Testimony (FRE 701)

■ FRE Rule 701 limits lay witness opinion testimony to opinions or inferences which are (1) rationally based on the witness' perception, (2) helpful to the trier of fact, and (3) not based on specialized knowledge. The Court has relied upon and/or cited to only one piece of such evidence to which Aroma specifically objected: consumer Lihong Wang's assertion that "I was only fortunate that the broken metal grater and broken pieces did not hurt my eyes and cut me seriously." *Gov.* Ex. 3C at ¶ 4. The Court finds that Ms. Wang does not need specialized knowledge to make such an inference. An ordinary reasonable person could conclude that an exploding juicer, sending broken pieces of metal and plastic flying through the air, could pose a threat to one's eyes. The Court notes that Ms. Wang asserts that she was cut on her arm from the incident, further supporting her opinion. Moreover, Ms. Wang's assertion is being introduced to show notice to Aroma, not for the truth of the matter that she was fortunate not to be hurt more seriously. Rule 701 does not exclude an opinion when offered for that purpose.

## IV. Aroma's Liability Under the Act

### A. Consumer Product Safety Act

The Consumer Product Safety Act ("CPSA" or "Act"), 15 U.S.C. § 2051 *et seq.,* imposes a safety reporting requirement on distributors of consumer products to immediately notify the U.S. Consumer Product Safety Commission ("Commission") upon receipt of certain information. The Act specifically requires:

> Every manufacturer of a consumer product distributed in commerce, and every distributor and retailer of such product, who obtains information which

reasonably supports the conclusion that such product -

 (1) . . .

 (2) contains a defect which could create a substantial product hazard described in subsection (a)(2) of this section [i.e. "creates a substantial risk to the public"]; *or*

 (3) creates an unreasonable risk of serious injury or death,

shall immediately inform the Commission of such . . . defect, or of such risk, unless such manufacturer, distributor, or retailer has actual knowledge that the Commission has been adequately informed of such defect, . . ., or such risk.

15 U.S.C. § 2064(b) (emphasis added). The statute is in the disjunctive; Aroma can be liable for failing to report under either subsection (2) or (3).

■■■ This reporting requirement was imposed upon consumer product manufacturers to protect the public health and safety—the sooner the Commission knows of a potential problem, the sooner it can investigate and take necessary action. "This notification requirement was statutorily imposed upon manufacturers . . . because they are often the first to receive information about hazardous consumer products." *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 982 (3d Cir.1984). "In enacting 15 U.S.C. § 2064(b), Congress intended to increase the likelihood that a substantial product hazard will come to the attention of the Commission in a timely fashion so that it could act swiftly to protect the consuming public." *United States v. Advance Mach. Co.*, 547 F.Supp. 1085, 1090 (D.Minn.1982) (legislative history citations omitted). The Commission set forth a "Statement of Enforcement Policy" to provide "additional clarification to help firms meet the reporting requirements" of the Act. 49 Fed.Reg. 13820. The Commission's guidelines instruct companies "When in doubt, firms should report. Firms

should clearly err on the side of over-reporting, rather than under-reporting." *Id.* at 13822.

The thrust of the Act is clearly for firms to quickly inform the Commission as soon as they might "reasonably believe" that their product, through defect or otherwise, poses a significant threat to consumers. Upon receipt of "first information", a company is required to report ***within 24 hours*** to the Commission. 16 C.F.R. § 1115.14(c) and (e). Companies are advised that they "should not await complete or accurate risk estimates before reporting . . . ." *Id.* at (c). While a firm may investigate to determine whether the information is reportable, a firm should not take more than 10 days unless it can demonstrate that such additional time is reasonable. *Id.* at (d). Companies should report as soon as they have information which "reasonably supports" the conclusion that the product contains a reportable defect or unreasonable risk. 15 U.S.C. § 2064(b).

Aroma formally notified the Commission regarding problems with the juicer, filing a preliminary report on November 16, 1998. Gov. Ex. 60B. The issue is whether, prior to that date, Aroma received information which "reasonably supported" the conclusion that the juicer either (i) contained a "defect" which created a "substantial product hazard", such that it "created a substantial risk to the public", § 2064(b)(2), or (ii) created an "unreasonable risk of serious injury or death." § 2064(b)(3).

## B. Liability

■■■ The Court finds that Aroma was in receipt of overwhelming evidence such that a reasonable person could conclude that the juicer contained a defect which created a substantial risk to the public. The Court will not set forth again the litany of phone calls and letters with which scared, angry, and often injured consumers bombarded the company. The Court

finds particularly noteworthy, however, several items in particular. As early as February 1998, Aroma had information which would reasonably imply that the juicer could have a dangerous defect, when consumer Richard Norton sent a letter stating that his juicer "SUDDENLY EXPLODED, THROWING WITH GREAT VIOLENCE PIECES OF THE CLEAR PLASTIC COVER AND SHREDS OF THE RAZOR–SHARP SEPARATOR SCREEN AS FAR AS EIGHT FEET . . . ." Gov. Ex. 2A (all capitals in original). Information of an actual injury came in mid-February, when consumer Lihong Wang called to say that she had been cut by her exploding juicer and was "fortunate that the broken metal grater and broken pieces did not hurt my eyes and cut me seriously." Gov. Ex. 3A and 3C. The first report of hospitalization and medical treatment came in late February or early March of 1998, when the daughter of consumer Frank Peel reported to Aroma that her elderly father was cut by the blade of the juicer as it penetrated through the plastic cover. Mr. Peel required 16 stitches in the hospital emergency room. Gov. Ex. 4C. Thus in a period of approximately only one month, Aroma received three telephone calls and two letters recounting exploding juicers, flying pieces of razor-sharp metal, and one emergency room visit. Hence, by at least early March, Aroma had enough information for a reasonable person to conclude that the juicer contained a defect, whether in the actual unit or in the instructions and warnings, that created a substantial risk to the public.

Aroma's duty to report is also independently triggered by § 2064(b)(3), which requires a firm to report upon first receipt of information from which a reasonable person could conclude that the juicer posed "an unreasonable risk of serious injury or death." This subsection does not reference a "defect" in the product. The incidents recounted above are enough for a reasonable person to be able to conclude that the juicer posed an unreasonable risk of serious injury or death.

## V. Aroma's Counter-arguments

Despite the above analysis, Defendant proffers several legal theories as to why summary judgement is inappropriate. Each will be analyzed in turn.

### A. Aroma's Expert Testimony Argument

■ Aroma contends that expert testimony is necessary for summary judgement because such terms as "unreasonable risk", "defect", and "substantial product hazard" are highly technical terms of art. For example, Aroma cites the definition for "unreasonable risk":

> In determining whether a product presents an unreasonable risk, the firm should examine the utility of the product, or the utility of the aspect of the product that causes the risk, the level of exposure of consumers to the risk, the nature and severity of the hazard presented, and the likelihood of resulting injury or death. In its analysis, the firm should also evaluate the state of the manufacturing or scientific art, the availability of alternative designs or products, and the feasibility of eliminating the risk.

16 C.F.R. § 1115.6(b). Since the government has not provided any expert testimony on these highly technical evaluations, so the argument goes, summary judgement is inappropriate.

Aroma mistakes the nature of the reporting requirement. Certainty is not the reporting threshold. Companies are required to report upon receipt of information which "reasonably supports" the conclusion that there is a defect. The standard is a "reasonable person" standard, not a "reasonable expert" standard.

Juicers and other kitchen appliances are within the commonplace knowledge of judges, as well as consumers and jurors. Furthermore, the standard for reporting is not whether the juicer actually contains a defect, but whether a reasonable person *could* conclude that the juicer had a defect. The Court holds that a reasonable person would not expect his or her juicer to explode and spray dangerous, razor-sharp shrapnel around the room; therefore, a reasonable person *could* conclude that the juicer manufactured by Aroma contained a defect. Aroma was informed of at least 23 incidents of the juicer shattering or "exploding", resulting in injuries to at least 19 people. The Court does not require expert testimony to find that a reasonable person *could* conclude that the juicer contained a defect, either in the actual unit or in the accompanying instructions.

Although not dispositive to this argument, the Act clearly envisions a common-sense and quick assessment of the information that firms receive: companies must report in 24 hours, with only 10 days allowed for investigation (16 C.F.R. § 1115.14(c)—(e)). Hence, the statute clearly does not allot enough time for the sort of in-depth expert analysis that Aroma contends is necessary on summary judgement to determine if information is reportable. Companies are specifically advised to over-report rather than under-report (49 Fed.Reg. at 13822), and that they "should not await complete or accurate risk estimates before reporting . . . ." 16 C.F.R. § 1115.14(c). Thus, the Act does not envision, and the Court rejects, Aroma's contention that in a summary judgement motion expert analysis or testimony is necessary to determine the alleged reportability of information under

the Act. There may be certain factual scenarios where the defect is beyond the common ken. This, however, is not such a case.

Moreover, Defendant does not present the affidavit of an expert suggesting that the 23 incidents of exploding juicers are not covered by 16 C.F.R. 1115.6(b). The only expert testimony offered by Defendant is that of Dr. Cox, an expert in failure analysis. Dr. Cox testified that Aroma's testing of the juicers after the initial unrecorded complaint(s) in January 1998 "was appropriate *for that time frame* for this scenario that developed." Ex. 21 at 17 (emphasis added). Dr. Cox is referring to the unrecorded initial complaint(s), not the litany of phone calls and letters sent to Aroma from February through October 1998. Dr. Cox did *not* testify that Aroma's testing for defects in its juicer was appropriate in light of these complaints of exploding juicers and injured consumers; his testimony is limited to "what they [Aroma] knew at the time" (Ex. 23 at 32), i.e. prior to the reports of injuries and medical treatment. Thus Dr. Cox's testimony does not raise a material issue of fact as to whether a reasonable person could conclude that the juicer contained a defect.

■■■ Even assuming *arguendo* that expert testimony was necessary to find Aroma liable under subsection (2), which specifically refers to "defect", the statute, the legislative history, and plain common-sense[5] do not support Aroma's contention that expert testimony is necessary to determine that a reasonable person could conclude that the juicer posed "an unreasonable risk of serious injury or death" under subsection (3). When citing to the "technical" definition of "unreasonable risk",[6] Aroma fails to cite the full passage

---

**5.** A concededly embarrassing thing to rely upon if one is reversed.

**6.** "In determining whether a product presents an unreasonable risk, the firm should exam-

in 16 C.F.R. 1115.6(b), which further states that "[t]he Commission expects firms to report if a *reasonable person* **could** conclude given the information available that a product creates an unreasonable risk of serious injury or death." (emphasis added). Aroma had a wealth of information from which a reasonable person could conclude that the juicer posed just such an unreasonable risk. Consumer after consumer called and wrote to complain that their juicer shattered or "exploded", and that sharp pieces of metal and plastic went flying through the air. Mr. Peel's emergency room visit demonstrated that the risk from exploding juicers was more than hypothetical. Gov. Ex. 4C. Moreover, Aroma deposed Ms. Mendoza; she testified that her exploding juicer severed nine arteries in her arm and caused significant, permanent damage. DSOF at 13. After this deposition, Aroma did not make a report to the Commission for almost *2 more months,* well past the 24 hour reporting requirement. Aroma produced a juicer, a consumer product designed to take an orange and separate it into orange juice and pulp. The Court rejects the claim that expert testimony is necessary to determine that this exploding juicer, which injured at least 22 people, of whom at least 7 required medical treatment, posed an unreasonable risk of serious injury or death.

### B. Aroma's "Knowingly" Argument

█ 15 U.S.C. § 2068(a)(4) makes it unlawful to fail to meet the reporting requirements of § 2064(b). Civil penalties are authorized for "knowingly" violating § 2068. 15 U.S.C. § 2069. Aroma contends that "knowingly" means that the

company must have known that it had the legal duty to report.

The Court finds this construction of the statute unconvincing. The Ninth Circuit has stated that "public welfare offenses are not to be constructed to require proof that the defendant knew he was violating the law in the absence of clear evidence of contrary congressional intent." *United States v. Weitzenhoff,* 35 F.3d 1275, 1285 (9th Cir.1993). The Court finds no clear evidence of congressional intent to impose such a requirement and Defendant fails to cite such. The entire thrust of the Act is to impose on companies in the consumer product business a duty to report fully and immediately so that the Commission might protect the public safety. Allowing companies that produce or distribute consumer products to avoid liability by pleading ignorance of the basic safety regulations governing their trade would be directly contrary to Congress' intent in enacting the *Consumer* Product *Safety* Act, which is designed to "protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b); *see also Young v. Robertshaw Controls Co.,* 560 F.Supp. 288, 291 (N.D.N.Y.1983).

█ Furthermore, Aroma did have actual notice of the reporting requirements. Prior to the first complaint in 1998 about the juicer, the company had received three letters from the Commission in 1996 and 1997 about unrelated products that cited 15 U.S.C. § 2064(b) and briefly explained the reporting requirements. *See* Gov. Ex. 50B *and* 50C. The company was specifically told,

The report(s) we have provided you may—either alone or with other infor-

---

ine the utility of the product, or the utility of the aspect of the product that causes the risk, the level of exposure of consumers to the risk, the nature and severity of the hazard presented, and the likelihood of resulting injury or

death. In its analysis, the firm should also evaluate the state of the manufacturing or scientific art, the availability of alternative designs or products, and the feasibility of eliminating the risk." 16 C.F.R. § 1115.6(b).

mation you have or may receive reasonably support a conclusion that a product contains a defect which could create a substantial product hazard, or creates an unreasonable risk of serious injury or death. If so, you are **required** under Section 15(b) of the Consumer Product Safety Act, 15 U.S.C.2064(b), to notify the CPSC. For more information on reporting requirements, please contact
. . . .

Gov. Ex. 50B (emphasis added).

### C. Aroma's Affirmative Defenses

Aroma contends that the Court must deny the motion for summary judgement because the government has failed to address Aroma's affirmative defenses set forth in their answer. Aroma cites no evidence to support their affirmative defenses and cites no authority for their contention that the moving party bears the burden of proof as to affirmative defenses for which no evidence is submitted. The Court has conducted a cursory review of the law governing summary judgement and can find no support for Aroma's contention. *See generally,* 3 SCHWARZER, TASHIMA, AND WAGSTAFFE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, Ch.14 "Summary Judgment" (2001). Where the non-moving party opposes summary judgement on the basis of affirmative defenses, the Ninth Circuit has held that "a conclusory statement of fact" in support of an affirmative defense is not enough to deny summary judgement (*United States v. Wilson,* 881 F.2d 596, 601 (9th Cir.1989)); Aroma has not even provided a conclusory statement of fact.

### D. Alleged Consumer Misuse

 Aroma contends that it adequately tested the juicer upon receipt of the initial complaint of shattering, and since the test failed to replicate the shattering, a reasonable inference is that the consumers must have misused the juicer, particularly by washing it in hot water or a dishwasher in contravention of the written instructions.

This argument fails for two independent reasons. First, Aroma, as the non-movant, is entitled to the benefit of any *reasonable* or "justifiable" inferences. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The inference that consumer misuse accounts for shattering is pure speculation contrary to the evidence. No consumer has indicated that the juicer was cleaned in an automatic dishwasher. DSOF at 19–20. Under penalty of perjury, more than a dozen consumers have testified that they did not clean the juicer in an automatic dishwasher. *Id.* Several consumers did not even have an automatic dishwasher. *Id.* In at least two instances, the juicer shattered the first time the consumer tried to use it. *Id.* Aroma's argument is simply that the juicer failed, and hence the consumer must be at fault.

Second, any misuse by consumers is irrelevant under the second independent basis of Aroma's liability for failing to report. Section 2064(b)(3) does not reference a product "defect", only "an unreasonable risk of serious injury or death". Any customer misuse by dishwashing would only tend to negate the conclusion that the product was defective, not that the juicer posed an unreasonable risk of serious injury or death.

### E. Aroma's Actual Knowledge that the Commission Had Been Adequately Informed

 Under § 2046(b), a company "shall immediately inform the Commission ... unless [the company] has **actual knowledge** that the Commission has been **adequately** informed" of the defect or substantial risk associated with the consumer product. (emphasis added). The first communication from a consumer to the Commission regarding the juicer was on March

4, 1998. Gov. Ex. 5B. However, the first communication from the Commission to Aroma regarding the juicer was not until June 8, 1998. Gov. Ex. 51A. Thus, the company had no *actual knowledge* that the Commission was aware of problems with the juicer until June 8, 1998, well past the time that a reasonable person could conclude that the juicer had a defect or posed an unreasonable risk of serious injury. Moreover, the letters the Commission sent to Aroma informing them of complaints they had received from consumers represented only seven incidents. *See* Gov. Ex. 1B. Before Aroma finally filed a report with the Commission on November 16, 1998, Aroma knew of at least 23 incidents injuring at least 22 people. DSOF at 18–19. The Commission was therefore not *adequately* informed of the problems with the juicers—Aroma had actual knowledge that the Commission was informed of only 7 of 23 incidents. For instance, Ms. Mendoza, the woman whose exploding juicer severed nine arteries in her arm, had not notified the Commission prior to the taking of her deposition by Aroma on September 21, 1998. *See* Gov. Ex. 1B. Aroma had no actual knowledge, and this Court has seen no evidence, that the Commission had any knowledge of the severe injuries suffered by Ms. Mendoza.

Furthermore, Aroma had been warned that just because the Commission was informing them of an incident, the company was not relieved of its reporting responsibilities. In three separate letters sent in regards to unrelated products in 1996 and 1997, the company was specifically told:

> The report(s) we have provided you may—either alone or with other information you have or may receive reasonably support a conclusion that a product contains a defect which could create a substantial product hazard, or creates an unreasonable risk of serious injury or death. If so, you are *required* under Section 15(b) of the Consumer Product Safety Act, 15 U.S.C.2064(b), to notify the CPSC. For more information on reporting requirements, please contact . . . .

Gov. Ex. 50B (emphasis added). The letters specifically state that rather than relieve Aroma of the reporting requirement, a letter from the Commission regarding an incident may actually trigger the reporting requirement. From the statutory scheme, it is evident to the Court why the Commission correctly maintains this view. When a consumer contacts the Commission, the consumer may not communicate the same information that is communicated to the company. Moreover, the company may have information from other sources which may, alone or in combination with the information from the consumer, trigger the reporting requirement. In other words, a letter from the Commission to a company about a consumer complaint does not itself relieve a company of the reporting requirement, unless the only information the company holds is the same as the information the Commission possesses. Otherwise, the company must still determine whether the information it has is reportable. The thrust of the statutory scheme is for information in the hands of companies to be disclosed to the Commission.

Aroma seems to place much significance on the fact that the Commission knew of problems in previous years with juicer models of other companies. *See, e.g.,* DSOF at 26. The Court fails to see the relevance of this information. Section 2046(b) places a reporting requirement on manufacturers, distributors, and retailers of consumer products to report to the Commission "immediately" in order to further the public safety. Nowhere does the Act place a requirement on the Commission to report to every manufacturer, distributor, and retailer of consumer products of problems with similar products. It is

the Commission's responsibility to monitor the industry, not vice-versa.

## VI. Conclusion

For the aforementioned reasons, Plaintiff's motion for summary judgement on the issue of liability is **GRANTED.**

**IT IS SO ORDERED.**