**UNITED STATES of America, Plaintiff–Appellee,**

v.

**MIRAMA ENTERPRISES, INC., a California corporation dba Aroma Housewares Co., Defendant–Appellant.**

No. 02–56466.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 2004.

Filed Oct. 28, 2004.

Patrick Jasperse, U.S. Department of Justice, Office of Consumer Litigation, Washington, DC, for the plaintiff-appellee.

John Morris, Higgs, Fletcher & Mack LLP, San Diego, CA, for the defendant-appellant.

Before: KOZINSKI, O'SCANNLAIN and SILVERMAN, Circuit Judges.

KOZINSKI, Circuit Judge:

We consider the appropriate range of penalties for violating the reporting requirements of the Consumer Product Safety Act, 15 U.S.C. §§ 2064(b), 2068(a)(4), 2069(a)(1).

### Facts

Mirama Enterprises, d/b/a Aroma Housewares Co. ("Aroma"), is a California

corporation that distributes electric kitchen appliances. Aroma distributed between 30,000 and 40,000 juice extractors in the United States. The juicers employed a rapidly spinning metal grater, whose sharp teeth pulverized fruits and vegetables that were inserted through a plastic chute.

Aroma began receiving consumer reports of failed juicers. Exploding juicers, the reports claimed, "[threw] with great violence pieces of the clear plastic cover and shreds of the razor-sharp separator screen as far as eight feet....:" One consumer called the juicer "an unsafe and dangerous machine which exploded in [his] face." A flying blade sliced the hand of another. And one injured woman was taken by ambulance to the hospital, where she stayed overnight, and sustained permanent damage to her fingers, hand and arm. *United States v. Mirama Enters., Inc.*, 185 F.Supp.2d 1148, 1153–54 (S.D.Cal.2002). In all, Aroma received complaints from twenty-three consumers. Aroma tested the juicers but was unable to replicate the malfunctions. It reported none, of this to the Consumer Product Safety Commission.

But some of the consumers did. Alerted to the problems, the Commission asked the company to report what it knew about the dangers posed by its juicers. Aroma disclosed the consumer complaints, as well as the results of its own tests. A few months later, Aroma and the Commission jointly announced that the juicers were being recalled.

The United States subsequently sued Aroma, alleging that the company had violated the reporting requirements of 15 U.S.C. § 2064(b)(2) and (b)(3). The district court granted partial summary judgment for the United States. *See Mirama Enters., Inc.*, 185 F.Supp.2d at 1158–59, 1164. After an evidentiary hearing, the court held that Aroma's failure to report each potentially dangerous product sold or distributed for sale to consumers was a separate offense, bringing the total number of offenses to somewhere between 30,000 and 40,000. The court ordered the company to pay $300,000 plus costs.[1] Aroma appeals.

Aroma does not contest liability; it challenges only the penalty, raising two issues. First, it asserts that the number of reporting violations can be no greater than the number of instances where it failed to report a particular defective unit—twenty-three; the number of units complained about by consumers. Second, Aroma claims the United States must prove that the juicer was actually defective before the company may be subjected to penalties for failing to report.

## Standard of Review

 Because both of the issues in this case involve statutory construction, we must first determine whether, and to what extent, we owe deference to the Commission's proffered interpretation. *See Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 315 (9th Cir.1989). We are aware of suggestions that the agency has previously articulated its position in this case. *See* Peter L. Winik, Consumer Product Safety Commission: Current Developments in Law and Practice A–4 (ABA Ctr. for Cont'g Legal Educ. Nat'l Inst.1997) ("The CPSC takes the position that language [sic] 'each product involved' means each individual unit of product sold to consum-

---

1. At the time of Aroma's failures to report, the maximum civil penalty for each reporting violation was $6000, with a $1.5 million cap for any related series of violations. *See* 15 U.S.C. § 2069(a)(3) (requiring adjustment of the penalty amount for inflation); 59 Fed.Reg. 66523–02 (Dec. 27, 1994). For 30,000 juicers, the maximum penalty would cap out at $1.5 million.

ers. Thus, in most cases of non-reporting, it is possible for the CPSC to argue that it can aggregate penalties up to the statutory maximum."). However, neither the parties' briefs nor our own research have revealed any published agency interpretations on the matter.[2] As there is no agency interpretation to which we may defer, we need not decide what level of deference we would otherwise owe. We therefore interpret the statute de novo.

## Analysis

■ **1.** The Consumer Product Safety Act ("CPSA") establishes a complex regulatory framework for keeping dangerous consumer products out of the marketplace—and away from the fingers, hands and other body parts of consumers. Among its most potent weapons is its reporting requirement. The CPSA requires manufacturers, distributors and retailers to inform the Commission promptly about potentially dangerous products and imposes civil penalties for failing to do so.

15 U.S.C. § 2064(b) provides:

Every manufacturer of a consumer product distributed in commerce, and every distributor and retailer of such product, who obtains information which reasonably supports the conclusion that such product—

. . .

(2) contains a defect which could create a substantial product hazard [by creating a substantial risk of injury to the public]; or

(3) creates unreasonable risk of serious injury or death,

shall immediately inform the Commission . . . of such defect, or of such risk,

unless such manufacturer, distributor, or retailer has actual knowledge that the Commission has been adequately informed of such defect, failure to comply, or such risk.

Section 2068(a)(4) makes it "unlawful for any person to . . . fail to furnish information required by section 2064(b)." Finally, section 2069(a) specifies the penalty for reporting violations:

Any person who knowingly violates section 2068 . . . shall be subject to a civil penalty not to exceed $[6000] for *each such violation.* . . . [A] violation of [section 2068(a)(4) ] *shall constitute a separate offense with respect to each consumer product involved,* except that the maximum civil penalty shall not exceed $[1,500,000] for any related series of violations.

15 U.S.C. § 2069(a)(1) (emphasis added); *see* note 1 *supra.*

■ The parties agree that the relevant violations are Aroma's failures to report and that the district court could properly have imposed a penalty for "each such violation." They disagree over how to determine the number of violations. Aroma suggests there is a single violation because only one product line is involved, albeit one of which there were numerous identical units sold. Alternatively, Aroma argues that it violated the reporting requirement at most twenty-three times—once for each failure to report a juicer that a consumer claimed had exploded. The government contends, and the district court held, that Aroma was required to report every one of its juicers in the stream of commerce, all of which it had reason to believe posed a

**2.** The government points to 16 C.F.R. §§ 1115.6 and 1115.12 as supporting its view that Aroma violated the statute once for each juicer that it had distributed but failed to report. Both regulations provide that sources other than consumer complaints can trigger

section 2064's reporting requirement, which suggests that the number of violations cannot simply be the number of complaints. *See* page 15300 *infra.* But the regulations do not directly address how to interpret the statute.

risk to the public. According to this reasoning, each juicer offered for sale to, or already in the hands of, consumers provided the basis for a separate violation.

Initially, we consider Aroma's suggestion that "consumer product" in section 2064(b) refers to the juicer model rather than to the individual units sold. This interpretation is problematic in view of the CPSA's penalty scheme, which imposes a small fine for each violation, capped at a much larger amount in the aggregate. *See* note 1 *supra.* The statutory cap necessarily contemplates that a single defect may affect a large number of products: Regardless of adjustments for inflation, the penalty caps out only after 250 violations. Aroma's interpretation would effectively render the cap meaningless. While a few product lines may share a common defect, it is almost inconceivable that 250 separate lines would possess the same defect. We will not presume that Congress adopted a statutory maximum that could never be reached.

Interpreting "consumer product" to refer to the product line also conflicts with the CPSA's definition of consumer product as "any *article,* or component part thereof, produced or distributed" for sale to or use by a consumer. *Id.* § 2052(a)(1) (emphasis added).[3] The ordinary meaning of "article" refers to an individual member of a class (such as a unit of Aroma's juicer line), rather than the class (or product line) itself.[4] Section 2064(b) thus requires that distributors report each individual unit about which they receive information that "reasonably supports the conclusion that such product ... contains a defect which could create a substantial product hazard ... or ... creates an unreasonable risk of serious injury or death." Accordingly, section 2069(a)(1)'s provision that violations "shall constitute a separate offense with respect to each consumer product involved" means that a company commits a separate offense for every potentially dangerous unit it fails to report.

Aroma maintains that there were at most twenty-three separate failures to report: Section 2069(a)(1) provides penalties for "each consumer product *involved* " (emphasis added), and Aroma received consumer complaints for only twenty-three units. But the fact that some two dozen units malfunctioned in precisely the same way is evidence that those units share a common defect, which may affect each of the thousands of identical units Aroma distributed. Indeed, it would make little sense to focus only on the particular units discovered to be defective rather than those others that may possess the same flaw. After a juicer has exploded, it no longer poses a serious risk—consumers presumably will no longer use the exploded unit. The explosions matter only because they provide information about the risks of using other identical units.[5]

---

**3.** The definition includes exceptions for certain products, such as tobacco and motor vehicles, none of which applies here. *See id.* § 2052(a)(1).

**4.** *See, e.g., The American Heritage Dictionary of the English Language* (4th ed.2000), *available at* http://www.bartleby.com/61/50/A0445000.html (defining article as "[a]n individual thing or element of a class; a particular object or item: *an article of clothing; articles of food* "); *Merriam–Webster Online Dictionary, at* http://www.m-w.com/cgi-bin/dictionary?book=Dictionary & va=article (last visited Sept. 19, 2004) (defining article as "a member of a class of things").

**5.** Aroma contends that section 2069(b), which includes "the number of defective products distributed" as a factor for the Commission to consider in determining how large a penalty it will seek, implicitly rejects this reasoning: Congress would not have required the Commission to consider the number of products involved if that number already determined the maximum penalty. But the statutory maximum will be reached in any case involving over 250 products. The Commission

Our interpretation is supported by the fact that consumer complaints are not the only source of information that can trigger section 2064(b)'s reporting requirement. Commission regulations note that "[s]uch information can include reports from experts, test reports, product liability lawsuits or claims, ... quality control data, scientific or epidemiological studies, reports of injury, information from other firms or government entities, and other relevant information." 16 C.F.R. § 1115.6(a); *see also* 16 C.F.R. § 1115.12(f). Aroma's proposed reading would squeeze much of the juice out of the statute: Companies would have no incentive to report information that they obtained through their own testing or any source other than consumer complaints, even if it clearly suggested a risk of serious injury or death, because they would face no penalties for failing to report.

Aroma was required to report not merely the twenty-three juicers that shattered, but the 30,000 to 40,000 juicers in the stream of commerce that might well pose an unreasonable risk of serious injury to consumers. When it failed to do so, Aroma committed 30,000 to 40,000 reporting offenses. Consequently, the district court could have imposed a penalty of up to $1.5 million. The court did not abuse its discretion in imposing a penalty of one-fifth the maximum amount. *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 229 n. 6, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (holding that where a statute provides a maximum, but not a minimum, civil penalty, the district court's imposition of a penalty below the maximum is reviewed for abuse of discretion).

■ 2. Aroma also argues that the United States must prove that a product is actually defective before a court may assess penalties for failure to report. The

company relies on 15 U.S.C. § 2069(b), which lists factors the Commission must consider in determining the penalty it will seek:

> In determining the amount of any penalty to be sought upon commencing an action seeking to assess a penalty for a violation of section 2068(a) of this title, *the Commission shall consider the nature of the product defect,* the severity of the risk of injury, the occurrence or absence of injury, the number of defective products distributed, and the appropriateness of such penalty in relation to the size of the business of the person charged.

15 U.S.C. § 2069(b) (emphasis added). Aroma contends that the requirement that "the Commission shall consider the nature of the product defect" presupposes that a defect exists.

■ The factors listed in section 2069(b) are directed to the Commission, not the district court. They are matters the Commission must consider "[i]n determining the amount of any penalty to be *sought* upon commencing an action" (emphasis added), not a list of factors the court must consider in *imposing* a penalty. Where a manufacturer fails to report a potential defect, but it turns out that no actual defect exists, the Commission may decide not to seek a penalty. That does not mean, however, that there was no violation of section 2064(b).

It makes sense for Congress to have imposed fines for reporting failures even when a product turns out not to be defective. Information about a possible defect triggers the duty to report, which in turn allows the Commission either to conclude that no defect exists or to require appropriate corrective action. Congress's

---

could reasonably believe a reporting violation involving 50,000 products merits a larger

penalty than one involving 500, even if the statutory maximum is the same in each case.

decision to impose penalties for reporting violations without requiring proof of a product defect encourages companies to provide necessary information to the Commission.

\* \* \*

Section 2064(b) requires a manufacturer, distributor or retailer of a product to notify the Commission if it obtains information that reasonably suggests the product creates serious risks of injury. Under section 2069(a)(1), failure to report is a separate offense with respect to each individual unit on the market or in the hands of consumers. Accordingly, the district court properly held that Aroma's failures to report constituted 30,000 to 40,000 separate offenses, and the court did not abuse its discretion in imposing a $300,000 penalty, regardless of whether Aroma's juicers were actually defective.

**AFFIRMED.**