Linda KEESLING, Harold Lephart and Priscilla Lephart, Hagar Anderson, James Bridges, Earl and Evelyn Haibe, Escar App, Mabel McGuffey, Ruth Amick, and Dora Butrum, Appellants–Plaintiffs,

v.

Frederick BEEGLE, III, John Bucholtz, Ronald Van Deusen, Florida Underwriting Co., Dennis Baugher, William Jones, and Advanced Insurance Marketing, Appellees–Defendants.

No. 18A04–0501–CV–10.

Court of Appeals of Indiana.

Dec. 21, 2006.

Richard N. Bell, Arend J. Abel, Kelley J. Johnson, Cohen & Malad, LLP, Indianapolis, IN, Attorneys for Appellants.

Frederick N. Beegle, III, Rockville, IN, Appellee Pro Se.

John B. Drummy, Pfenne P. Cantrell, Eric D. Johnson, Kightlinger & Gray, LLP, Indianapolis, IN, Attorneys for Appellee John Bucholtz.

David S. Wallace, Muncie, IN, Attorney for Appellees Florida Underwriting Co. and Dennis Baugher.

B. Joseph Davis, Muncie, IN, Attorney for Appellees William Jones and Advanced Insurance Marketing.

## OPINION

CRONE, Judge.

### Case Summary

Plaintiffs Linda Keesling, Harold and Priscilla Lephart, Hagar Anderson, James Bridges, Earl and Evelyn Haibe, Escar App, Mabel McGuffey, Ruth Amick, and Dora Butrum (collectively, "Appellants") appeal the trial court's orders granting summary judgment in favor of defendants Frederick Beegle, III, John Bucholtz, Ronald Van Deusen, Florida Underwriting Co., Dennis Baugher, William Jones, and Advanced Insurance Marketing (collectively, "Appellees"). We affirm in part, reverse in part, and remand.

### Issues

We consolidate, reorder, and restate Appellants' four issues as the following two:

I. Whether the trial court abused its discretion in excluding the affidavit of Joe Richman; and

II. Whether the trial court properly granted summary judgment in favor of Appellees.

### Facts and Procedural History[1]

The facts most favorable to Appellants, the non-movants, indicate that in 1986, Paul Rubera founded Alpha Telcom, Inc. ("Alpha"), an Oregon company that sold, installed, and maintained telephones and business systems. *S.E.C. v. Alpha Telcom, Inc.*, 187 F.Supp.2d 1250, 1254 (D.Or. 2002), *aff'd*, 350 F.3d 1084 (9th Cir.2003).

In 1997, Charles Tummino approached Rubera and suggested selling "payphones to individuals who would then enter into a service agreement with Alpha to install, service, and maintain the payphones." *Id.* Rubera consulted Alpha's attorney, Dan Lacy, who issued an opinion letter concluding that the arrangement would not constitute the sale of a security. Lacy sought an opinion from Florida attorney James Leone, who reached the same conclusion.

"In October 1998, American Telecommunications Company, Inc. (ATC) was created. Tummino operated ATC as the marketing and sales arm of the payphone program, while Alpha's focus was on obtaining phone sites, installation, service and management of the phones." *Id.* at 1255. Before retiring from ATC in late 1998, Tummino introduced Rubera to Ross Rambach and Mark Kennison, owners of Strategic Partnership Alliance, LLC ("SPA"). SPA sold programs similar to those offered by Alpha. In early 1999, Rubera hired SPA "as an independent marketing and sales firm for ATC. Thereafter, SPA was responsible for hiring, training and supervising the sales representatives who were marketing the payphone program." *Id.* at 1256.

Rambach and Kennison contacted Dennis Baugher, president and sole owner of Florida Underwriting, who agreed to recruit sales representatives for the payphone program. Each sales representative signed an agreement with ATC in which he or she "expressly acknowledge[d] that he/she [would] be acting as an independent contractor and not as an employee, for all purposes[.]" *Id.* at 838. Baugher received override commissions on the sales made by his recruits.[2] Baugher re-

1. In their brief, Appellants include many incidental facts that are irrelevant to the issues raised in their appeal. Appellants also make factual assertions based on an affidavit that was excluded by the trial court. We admon-

ish counsel to refrain from doing likewise in future cases.

2. An override commission is a "commission paid to a manager on a sale made by a

cruited William Jones, co-owner of Advanced Insurance Marketing, who in turn recruited sales representative Joe Richman.[3] Jones received an override commission on Richman's sales. Richman sold payphones to plaintiffs Linda Keesling, Harold and Priscilla Lephart, and Hagar Anderson.[4]

Rambach also contacted John Lang, who recruited sales representative Ronald Van Deusen. Van Deusen sold payphones to plaintiff James Bridges. Other sales representatives were also recruited. John Bucholtz sold payphones to plaintiffs Earl and Evelyn Haibe, Escar App, Mabel McGuffey, Ruth Amick, and Dora Butrum. Frederick Beegle, III, also sold payphones but not to any of the Appellants.

According to Appellants' fourth amended complaint, investors agreed to pay $5,000 per phone, and approximately ninety percent of the investors entered into an additional agreement with Alpha to service their phones. Appellants' App. at 111. The service agreements "provided that investors were to receive thirty percent of the net revenue from the phone, while Alpha was to receive seventy percent as a monthly fee." *Id.* at 112. "[I]f revenues from the phone did not generate a base amount of $58.34 in any given month (which amounts to a fourteen percent return on a $5,000 investment), Alpha agreed to waive a portion of its seventy percent fee to maintain that monthly base payment." *Id.* "Alpha created a computer program that automatically paid each investor the base amount each month, regardless of whether the investor's particular phone generated enough revenue to pay that amount." *Id.* Investors were allowed to sell the phones back at the original price after thirty-six months and were also given the option of purchasing buyback insurance, which "would cover the investor's purchase price if for some reason the company became unable to repurchase the phones." *Id.* at 111–12. Alpha's revenues failed to cover its expenses, and in August 2001, Alpha filed for Chapter 11 bankruptcy protection.[5]

In February 2002, four Appellants filed a complaint alleging that the defendants had directly or indirectly sold them unregistered securities in violation of the Indiana Securities Act. Appellants also alleged that certain defendants had violated the Indiana Corrupt Business Influence Act and had committed theft, conversion,

---

subordinate." BLACK'S LAW DICTIONARY 1136 (8th ed.2004).

**3.** For the sake of convenience, we refer to Baugher and Florida Underwriting as "Baugher" and to Jones and Advanced Insurance Marketing as "Jones" unless otherwise indicated.

**4.** The designated evidence is conflicting as to whether Richman or Robert Hall was Anderson's sales representative. *Compare* Appellants' App. at 668 (affidavit from Baugher stating that he received an override commission on sales to Anderson by Richman) *with id.* at 803 (affidavit from Tom Anderson, Anderson's son and attorney-in-fact, stating that Robert Hall sold payphones to his mother). We address this issue in greater detail in section II(A)(1), *infra.*

**5.** Appellants allege that the payphone program was a pyramid or Ponzi scheme, but the district court in *Alpha Telcom* attributed Alpha's financial woes to "bad advice, poor management," the acquisition of worthless or nonexistent payphone sites by one of Rambach and Kennison's enterprises, and "sudden artificial buyback demand created by SPA, and the accompanying sudden artificial demand for new phones." 187 F.Supp.2d at 1261, 1262. Thus, it would appear that the fact that "payments made by Alpha to existing investors came from the sale of phones to new investors" was a matter of default, rather than design, as Appellants contend. *Id.* at 1257.

and common law fraud. In March 2004, Bucholtz moved for summary judgment. In August 2004, Appellants filed their fourth amended complaint. In November 2004, Beegle moved for summary judgment. The trial court ultimately granted final summary judgment in favor of Beegle as to all Appellants and in favor of Bucholtz as to Keesling, the Lepharts, Anderson, and Bridges. Bucholtz settled with the remaining Appellants. Appellants timely filed notices of appeal.

In January 2005, Jones moved for summary judgment. In February 2005, Baugher moved for summary judgment. On March 16, 2005, the trial court held a hearing on those and other pending summary judgment motions. On March 29, 2005, the trial court issued orders granting summary judgment in favor of Baugher and Jones. Both orders stated, "If [Appellants] believe the Court has disregarded *evidence in the record* that creates an issue of fact, [Appellants] should file a Motion to Reconsider as soon as possible, preferably within five (5) days from this order's date, in order for the Court to consider the Motion and correct any errors before the trial date scheduled in this case." Appellants' App. at 542, 547 (emphasis added). On April 4, 2005, Appellants filed a motion to reconsider, which the trial court denied on April 6. On April 7, 2005, Appellants filed a motion for leave to supplement their motion to reconsider with an affidavit from Richman, which the trial court denied that day. On April 8, 2005, the trial court entered final judgment in favor of Baugher and Jones. Appellants timely filed a notice of appeal.

In May 2005, Van Deusen moved for partial summary judgment. In August 2005, the trial court granted Van Deusen's motion as to all Appellants except James Bridges.[6] Appellants timely filed a notice of appeal.

On June 9, 2005, this Court consolidated the appeals involving Beegle, Bucholtz, Baugher, and Jones, which were fully briefed as of December 14, 2005. On November 8, 2005, this Court consolidated three additional appeals involving Van

---

**6.** According to Appellants, Bridges's claims against Van Deusen remain pending in the trial court. Appellants correctly observe that although the trial court's August 2005 order granting summary judgment in favor of Van Deusen against the remaining Appellants states that "Final Judgment is hereby entered" in Van Deusen's favor, Appellants' App. at 625, the order does not comply with the certification requirements of Indiana Trial Rule 54(B) and is therefore not a final order. *See* Ind. Trial Rule 54(B) ("A judgment as to one or more but fewer than all of the claims or parties is final *when the court in writing expressly determines that there is no just reason for delay, and in writing expressly directs entry of judgment,* and an appeal may be taken upon this or other issues resolved by the judgment; but in other cases a judgment, decision or order as to less than all the claims or parties is not final.") (emphasis added); *Georgos v. Jackson,* 790 N.E.2d 448, 452 (Ind. 2003) ("Trial Rule 54(B) certification of an order that disposes of less than the entire case must contain the magic language of the rule. This is intended to provide a bright line so there is no mistaking whether an interim order is or is not appealable."). Appellants state that they "have requested that the trial court enter a nunc pro tunc order curing this deficiency" and ask that we "not consider any issues relating to the finality of the Van Deusen judgment until the trial court acts." Appellants' Br. at 4 n. 2. A review of the record in the companion case of *Leone v. Keesling,* No. 18A04–0510–CV–626, 858 N.E.2d 1009, 2006 WL 3759396 (Ind.Ct.App. Dec. 21, 2006), reveals that Appellants made their request on March 2, 2006, the date their original brief in this appeal was filed, and that the trial court made a corrective nunc pro tunc entry the following day. Appellees' App. at 57 (chronological case summary). Appellants do not mention this development in their reply brief and have not taken further action regarding the trial court's ruling in favor of Van Deusen.

Deusen, Leone, and David Winstead. On January 31, 2006, this Court vacated in part the November 2005 order, leaving the Van Deusen appeal consolidated with the instant appeal and ordering rebriefing. Leone and Winstead are appellees in a second appeal, *see Keesling v. Winstead,* No. 18A02–0601–CV–73, 858 N.E.2d 996, 2006 WL 3742214 (Ind.Ct.App. Dec.21, 2006), and Leone is the appellant in a third, *see Leone v. Keesling,* No. 18A04–0510–CV–626, 858 N.E.2d 1009, 2006 WL 3759396 (Ind.Ct.App. Dec. 21, 2006). We now address the merits of Appellants' appeal.

## Discussion and Decision

### I. Exclusion of Richman's Affidavit

■ Because Appellants rely on statements in the affidavit of sales representative Joe Richman in attempting to establish genuine issues of material fact, we first address their contention that the trial court improperly excluded the affidavit. "The admission or exclusion of evidence is a determination entrusted to the discretion of the trial court, and we will reverse a trial court's decision only when the court has abused its discretion." *Lachenman v. Stice,* 838 N.E.2d 451, 464 (Ind.Ct.App. 2005), *trans. denied* (2006).[7]

■ Appellants assert that the trial court had discretion to admit the affidavit as "supplemental evidence" under Indiana Trial Rule 56(E). Appellants' Br. at 24. Trial Rule 56(E) states in pertinent part that "[t]he court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Our supreme court has stated that it is within the trial court's discretion to accept an affidavit filed later than the thirty-day deadline specified in Trial Rule 56(C) for responding to a summary judgment motion. *Ind. Univ. Med. Ctr., Riley Hosp. for Children v. Logan,* 728 N.E.2d 855, 858 (Ind.2000). Even assuming, without deciding, that Richman's affidavit "supplemented" affidavits from Baugher, Jones, Beegle, and Van Deusen that Appellants timely designated in opposition to Baugher's and Jones's summary judgment motions, we cannot conclude that the trial court abused its discretion in excluding an affidavit that was filed after it held a hearing and ruled on the motions. *Cf. Fort Wayne Lodge, LLC v. EBH Corp.,* 805 N.E.2d 876, 885–86 (Ind.Ct.App.2004) (finding no abuse of discretion in admission of supplemental affidavit filed after thirty-day deadline but before summary judgment hearing).[8]

---

7. In his affidavit, Richman stated, among other things, that Jones and Baugher provided him with brochures and a manual regarding the payphone program, that he relied on their direction in conducting his sales activities, and that he received updates from them regarding the payphone program. Appellants' App. at 558–560. Appellants complain that the trial court's order "gave no reason at all for excluding the Richman affidavit" and claim that "[s]uch an order is not the reasoned exercise of discretion; it is the *absence* of the exercise of discretion." Appellant's Br. at 25. The trial court was not required to give a reason for excluding the affidavit, and its decision to exclude the affidavit constitutes an exercise of discretion.

8. Appellants contend that the material in Richman's affidavit was unavailable until the day before it was filed. Appellants' Br. at 24. This contention is not well taken. After Richman failed to appear at a deposition set for September 3, 2003, Appellants failed to exercise due diligence to obtain his testimony by other means, such as a motion to compel. Only after the trial court entered summary judgment against Appellants and "it became clear that [Baugher and Jones] had hung him out to dry" did Appellants obtain an affidavit from Richman. Appellants' Br. at 24. The trial court properly refused to consider Appellants' twelfth-hour revelations.

## *II. Summary Judgment*

We now address Appellants' arguments regarding the trial court's grant of summary judgment in favor of Appellees. Our standard of review is well settled:

> Summary judgment is appropriate only where the designated evidentiary matter shows that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. When reviewing a grant of a motion for summary judgment, we stand in the shoes of the trial court. Once the moving party demonstrates, prima facie, that there are no genuine issues of material fact as to any determinative issue, the burden falls upon the non-moving party to come forward with contrary evidence. The non-moving party may not rest upon the pleadings but must instead set forth specific facts, using supporting materials contemplated under Trial Rule 56, which show the existence of a genuine issue for trial. The party appealing the grant of summary judgment bears the burden of persuading this court that the trial court erred, but we still carefully scrutinize the entry of summary judgment to ensure that the non-prevailing party was not denied its day in court. We do not weigh the evidence but rather consider the facts in the light most favorable to the non-moving party. We may sustain the judgment upon any theory supported by the designated evidence. The trial court here entered specific findings of fact and conclusions thereon. Although such findings and conclusions fa-

cilitate appellate review by offering insight into the trial court's reasons for granting summary judgment, they do not alter our standard of review and are not binding upon this court.

*Legacy Healthcare, Inc. v. Barnes & Thornburg,* 837 N.E.2d 619, 624–25 (Ind. Ct.App.2005) (citations omitted), *trans. denied* (2006). We consider the claims against each of the Appellees in turn.

### *II(A)(1). Baugher—Indiana Securities Act Violations* [9]

Indiana Code Section 23–2–1–19 of the Indiana Securities Act ("the Act") reads in relevant part as follows:

> (a) A person who offers or sells a security in violation of this chapter,[10] and who does not sustain the burden of proof that the person did not know and in the exercise of reasonable care could not have known of the violation, is liable to any other party to the transaction who did not knowingly participate in the violation or who did not have, at the time of the transaction, knowledge of the violation, who may sue either at law or in equity to rescind the transaction or to recover the consideration paid. . . .

> . . . .

> (d) A person who directly or indirectly controls a person liable under subsection (a), . . . a partner, officer, or director of the person, a person occupying a similar status or performing similar functions, an employee of a person who materially aids in the conduct creating the liability, and a broker-dealer or

---

**9.** Here, as elsewhere, "Baugher" refers to Baugher and Florida Underwriting.

**10.** According to Appellants, the trial court determined that the payphones were securities (and thus were unregistered securities in violation of the Act). Appellants' Br. at 8 n. 5; *see* Ind.Code § 23–2–1–1(k) (defining "security" for purposes of the Act). Appellants

do not support this statement with a citation to the voluminous appendices, but since Appellees do not challenge it, we assume it to be true for purposes of this appeal. Also, neither Appellants nor Appellees dispute that Indiana Code Section 23–2–1–19 creates a private right of action for violations of the Act.

agent who materially aids in the conduct are also liable jointly and severally with and to the same extent as the person, unless the person who is liable sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons liable.

Appellants and Baugher agree that the only potential issues of material fact are (1) whether Baugher directly or indirectly controlled sales representatives who sold payphones to Appellants and (2) whether, as a broker-dealer,[11] Baugher materially aided in the sales representatives' conduct for purposes of the Act.[12]

With respect to the first issue, Appellants contend that Baugher controlled sales representatives Richman and Hall by recruiting them for the payphone program, paying their commissions, and receiving override commissions on their payphone sales. In an affidavit, Baugher stated that he recruited only Jones, that he received override commissions only for sales made by Richman, and that Richman made sales to Keesling, the Lepharts, and Anderson. Appellants' App. at 670. Although there is evidence to suggest that Hall made sales to Anderson (as indicated in footnote 5, *supra*), Appellants point to no designated evidence that Baugher received override commissions on those sales or that he recruited Hall and Richman for the payphone program. As for Jones, there is no evidence that he made sales to any of the Appellants. As such, we will address the issue of control only with respect to Richman, whom Baugher did not recruit.

█ Whether a person has "controlled" another person for purposes of the Act is generally a question of fact governed by common law. *See Kirchoff v. Selby*, 703 N.E.2d 644, 651 (Ind.1998).[13] No Indiana statute defines, and no Indiana court has interpreted, the word "controls" as used in Indiana Code Section 23–2–1–19, which is based on the Federal Securities Act. *Id.* at 650. Consequently, Appellants rely on federal caselaw interpreting the federal act as persuasive authority for their argument that Baugher controlled Richman by allegedly paying his commissions and receiving override commissions on his payphone sales.

The statements in Baugher's affidavit regarding commissions are phrased in the passive voice; thus, the identity of the payor is ambiguous. *See* Appellants' App. at 668 ("As an independent marketer I was to receive an 18% commission on sales made by my recruited sales reps. The sales reps would be paid a commission of 12% to 17% and I would then receive an 'override commission', i.e. the difference between the 18% and the sales reps' commission."). That said, Appellants have designated no evidence that Baugher paid Richman's commissions. In fact, Richman's affidavit indicates that Baugher did

---

**11.** Indiana Code Section 23–2–1–1(c) defines "broker-dealer" in pertinent part as "a person engaged in the business of effecting offers, sales, or purchases of securities for the account of others or for the person's own account." The trial court assumed Baugher and Jones to be broker-dealers for purposes of their summary judgment motions.

**12.** Contrary to Baugher's assertion, there is nothing to suggest that a party cannot be both

"[a] person who directly or indirectly controls a person liable under subsection (a), (b), or (c)" of Indiana Code Section 23–2–1–19 and "a broker-dealer ... who materially aids in the conduct creating the liability[.]"

**13.** We say "generally" here because it is conceivable that such a determination could be made as a matter of law.

*not* pay his commissions. *See id.* at 559 ("Mr. Jones even advanced me commissions when SPA Marketing failed to pay me as promised after I discovered I had not been properly paid by SPA Marketing."). We acknowledge that the trial court properly excluded Richman's affidavit, but it would be unjust to allow Appellants to take a contrary position at this stage of the proceedings.

■ This leaves us, then, with Baugher's receipt of override commissions on Richman's payphone sales. There is federal precedent to suggest that a party that receives a commission on a salesperson's transaction may be found to be in "control" of that person for purposes of federal law [14] if that party cannot show that it was not negligent in its supervision and that it had "maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel." *Marbury Mgmt., Inc. v. Kohn,* 629 F.2d 705, 716 (2nd Cir.1980), *cert. denied.* Although there is no traditional employer/employee relationship in this case, as there was in *Marbury,* we see no compelling reason for distinguishing on this basis. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1573–74 (9th Cir.1990) (declining to draw distinction between employees of broker-dealers and independent contractors in determining whether broker-dealer exercised control over another for purposes of federal securities act, stating that to do so "would be an unduly restrictive reading of the statute and would tend to frustrate Congress' goal of protecting investors") (footnote omitted), *cert. denied* (1991); *see also Harrison v. Dean Witter Reynolds,*

*Inc.,* 974 F.2d 873, 881 (7th Cir.1992) ("We have long viewed the statute [15 U.S.C. § 78t] as remedial, to be construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a 'control person' liable.") (citation and internal quotation marks omitted), *cert. denied* (1993). As such, we find that a genuine issue of material fact exists regarding whether Baugher "controlled" Richman for purposes of Indiana Code Section 23–2–1–19(d).

■ Likewise, we find a genuine issue of material fact as to whether Baugher, as a broker-dealer, "materially aided" Richman for purposes of the Act. *See Kirchoff,* 703 N.E.2d at 652–53 (indicating that whether conduct amounts to "material aid" is a question of fact and that Ind.Code § 23–2–1–19(d) "plainly permits recovery under some circumstances from persons who are not sellers to the plaintiff purchaser"). Therefore, we reverse the trial court's grant of summary judgment in favor of Baugher as to his alleged violations of the Act and remand for further proceedings.

### II(A)(2). Baugher—RICO Violations

Appellants alleged that Appellees violated Indiana's Corrupt Business Influence Act by being "employed by or associated with an enterprise" and "knowingly or intentionally conduct[ing] or otherwise participat[ing] in the activities of [that] enterprise through a pattern of racketeering activity." Ind.Code § 35–45–6–2(3). Indiana Code Section 35–45–6–1 defines "enterprise" as "(1) a sole proprietorship,

---

14. *See* 15 U.S.C. § 78t(a) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."). Indiana Code Section 23–2–1–19(d) contains a similar "good faith" provision.

corporation, limited liability company, partnership, business trust, or governmental entity; or (2) a union, an association, or a group, whether a legal entity or merely associated in fact." In this case, Appellants alleged that "the enterprise was the investment opportunity known as the PAYPHONE PROGRAM, [with] which all of all these Defendants [were] associated in fact, by either written or oral contract and/or agreement to sell the investment opportunities which were unregistered securities in violation of IC 23–2–1." Appellants' App. at 143. "Racketeering activity" is defined in pertinent part as "to commit, to attempt to commit, to conspire to commit a violation of, or aiding and abetting in a violation of" numerous statutes, including the Indiana Securities Act. Ind.Code § 35–45–6–1. A "pattern of racketeering activity" is "engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents." *Id.* Appellants alleged that the "pattern of racketeering activity" was the commission of "at least two sales" of unregistered securities to Indiana investors in violation of the Indiana Securities Act. Appellants' App. at 144.

Indiana's racketeering statute is patterned after the federal Racketeer Influenced and Corrupt Organization Act ("RICO"). *Waldon v. State,* 829 N.E.2d 168, 176 (Ind.Ct.App.2005), *trans. denied.* As such, Appellants rely on federal case-law as persuasive authority in asserting that the trial court erred in granting summary judgment in favor of Appellees on Appellants' RICO claim. It is important to note, however, that the federal RICO statute is worded differently from its Indiana counterpart, in that it makes it unlawful for a person "employed by or associated with [an] enterprise ... to conduct or participate, directly or indirectly, *in the conduct of* such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c) (emphasis added).[15] With this distinction in mind, we turn to *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), in which the U.S. Supreme Court addressed the RICO liability of an accounting firm in a securities fraud case arising out of the bankruptcy of a farm cooperative:

> "In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.' " ....

> The narrow question in this case is the meaning of the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The word "conduct" is used twice, and it seems reasonable to give each use a similar construction. As a verb, "conduct" means to lead, run, manage, or direct. Webster's Third New International Dictionary 474 (1976). Petitioners urge us to read "conduct" as "carry on," so that almost any involvement in the affairs of an enterprise would satisfy the "conduct or participate" requirement. But context is important, and in the context of the phrase "to conduct ...

---

**15.** In *Yoder Grain, Inc. v. Antalis,* 722 N.E.2d 840 (Ind.Ct.App.2000), another panel of this Court noted that Indiana's RICO statute is patterned after the federal RICO statute and addressed the plaintiffs' "federal and state RICO claims jointly" without examining the differences between the respective statutes. *Id.* at 845. Consequently, we do not rely on *Yoder Grain's* RICO analysis here.

[an] enterprise's affairs," the word indicates some degree of direction.

. . . .

The more difficult question is what to make of the word "participate." This Court previously has characterized this word as a "ter[m] ... of breadth." Petitioners argue that Congress used "participate" as a synonym for "aid and abet." That would be a term of breadth indeed, for "aid and abet" "comprehends all assistance rendered by words, acts, encouragement, support, or presence." Black's Law Dictionary 68 (6th ed.1990). But within the context of § 1962(c), "participate" appears to have a narrower meaning. We may mark the limits of what the term might mean by looking again at what Congress did not say. On the one hand, "to participate ... in the conduct of ... affairs" must be broader than "to conduct affairs" or the "participate" phrase would be superfluous. On the other hand, as we already have noted, "to participate ... in the conduct of ... affairs" must be narrower than "to participate in affairs" or Congress' repetition of the word "conduct" would serve no purpose. It seems that Congress chose a middle ground, consistent with a common understanding of the word "participate"—"to take part in." Webster's Third New International Dictionary 1646 (1976).

Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "di-

rectly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. The 'operation or management' test expresses this requirement in a formulation that is easy to apply.

*Id.* at 177–79 (footnotes and some citations omitted).

The Court buttressed its interpretation of the federal RICO statute with a review of its legislative history and stated that "one is not liable under that provision unless one has participated in the operation or management of the enterprise itself." *Id.* at 183. The Court noted, however, that an "enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise might also be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184 (footnote omitted). Ultimately, the Court determined that the accounting firm's failure to inform the farm cooperative's board that the cooperative was possibly insolvent did not amount to conducting or participating in the cooperative's affairs for purposes of the federal RICO statute. *Id.* at 186.

Returning to the instant case, we observe that Indiana's RICO statute sweeps more broadly than the federal statute, in that it speaks of "conduct[ing] or otherwise participat[ing] *in the activities of* [an] enterprise[.]" Ind.Code § 35–45–6–2(3) (emphasis added). Clearly, "activities" encompasses a wider range of exploits than "conduct" and does not require "an element of direction." *Reves,* 507 U.S. at 178, 113 S.Ct. 1163; *see* Dictionary.com, http://dictionary. reference.com/browse/activity (defining "activity" as "a specific

deed, action, function, or sphere of action") (last visited Nov. 13, 2006). As such, Indiana's RICO statute applies to all those employed by or associated with an enterprise who knowingly or intentionally conduct or otherwise participate in the "activities" of an enterprise through a pattern of racketeering activity, whether as "generals or foot soldiers." *United States v. Oreto,* 37 F.3d 739, 751 (1st Cir.1994) (addressing applicability of federal RICO statute in loan sharking case), *cert. denied* (1995).

All of this goes to say that the federal RICO cases cited by both parties are of limited persuasive value in determining whether there is a genuine issue of material fact regarding Appellees' liability under Indiana's RICO statute. At the very least, Baugher was associated with the payphone program enterprise and knowingly or intentionally participated in the activities of that enterprise. *See* Ind.Code § 35–45–6–2(3).[16] In his summary judgment motion, Baugher addressed the following: (1) whether he "participated in the operation or management" of the payphone program pursuant to *Reves* and (2) whether he proximately caused Appellants' alleged injuries. Appellants' App. at 483 (citing *Raybestos Prods. Co. v. Younger,* 54 F.3d 1234, 1243 (7th Cir.1995)). The foregoing discussion renders the first question moot, so we turn our attention to the second.

Indiana Code Section 34–24–2–6(b) provides that an "aggrieved person" may bring a civil RICO action against a person who has violated Indiana Code Section 35–45–6–2 "for damages suffered as a result of corrupt business influence." Indiana Code Section 34–6–2–6 defines "aggrieved person" in pertinent part as "[a] person who has an interest in property or in an enterprise that ... has suffered damages or harm as a result of corrupt business influence[.]" Ind.Code § 34–6–2–6(1)(B). If the aggrieved person shows by a preponderance of the evidence that he or she "has been damaged by the corrupt business influence," the person may recover treble damages, costs, attorney's fees, and punitive damages. Ind.Code § 34–24–2–6(b).

We have found no Indiana state cases defining the phrase "as a result of" for purposes of Indiana Code Section 34–24–2–6(b). That statute's federal counterpart says that "[a]ny person injured in his business or property *by reason of* a violation of [the federal RICO statute] may sue therefor in any appropriate United States district court[.]" 18 U.S.C. § 1964(c) (emphasis added). In *Holmes v. SIPC,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the U.S. Supreme Court interpreted this provision as requiring a showing of proximate cause:

**16.** Although Appellants' fourth amended complaint does not specifically so state, it seems clear that Appellants alleged that Baugher and Jones aided and abetted the payphone program sales representatives in the alleged pattern of racketeering activity, i.e., in at least two sales of unregistered securities. Appellants raise a conspiracy theory of RICO liability in their reply brief. *See* Appellants' Reply Br. at 13–15. We note, however, that they did not advance such a theory in their fourth amended complaint, in their responses to Appellees' motions for summary judgment, at the summary judgment hearing, or in their original brief. Therefore, we consider Appellants' conspiracy argument waived. *See*

*McGill v. Ling,* 801 N.E.2d 678, 687 (Ind.Ct. App.2004) ("Generally, a party may not raise an issue on appeal that was not raised to the trial court, even in summary judgment proceedings."), *trans. denied;* Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief."); *see also Yoder Grain,* 722 N.E.2d at 849 ("To state a claim under the conspiracy provision of RICO, the plaintiff must show that the defendant 1) agreed to acquire or maintain interest or control of an enterprise or participate in the affairs of an enterprise through a pattern of racketeering activity and 2) further agreed that someone would commit at least two predicate acts to accomplish these goals.").

Here we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed.1984). Accordingly, among the many shapes this concept took at common law was a demand for some direct relation between the injury asserted and the injurious conduct alleged.

*Id.* at 268, 112 S.Ct. 1311 (citation omitted).

In *Raybestos,* 54 F.3d 1234, the Seventh Circuit relied on *Holmes* in addressing an Indiana RICO claim:

To establish that a defendant's racketeering activities damaged or injured a civil plaintiff, the plaintiff must demonstrate that the defendant's actions "proximately caused" the injury. "Proximate cause" exists when there is "some direct relation between the injury asserted and the injurious conduct alleged." How "direct," of course, cannot be reduced to a single, uniformly applicable equation. Instead, notions of justice and policy often dictate the boundaries of "proximate causation."

*Id.* at 1243 (footnote omitted) (citing, *inter alia, Holmes* ).[17]

■■■■ We are not bound by the Seventh Circuit's interpretation of Indiana Code Section 34–24–2–6(b),[18] but given that this statute is even more specific than 18 U.S.C. § 1964(c) in requiring a causal relationship between a defendant's racketeering activities and a plaintiff's injuries, we agree that a showing of proximate cause is required for an Indiana RICO claim. The Indiana Supreme Court has stated that "[a]lthough a rigorous definition is elusive, proximate cause has been defined as 'that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" *Peters v. Forster,* 804 N.E.2d 736, 743 (Ind.2004) (citation omitted). "Proximate cause is generally a question of fact for the jury to decide." *Godby v. Whitehead,* 837 N.E.2d 146, 151 (Ind.Ct.App.2005), *trans. denied* (2006). We conclude that a genuine issue of material fact exists regarding whether Baugher proximately caused Appellants' alleged damages. We therefore reverse the trial court's grant of summary judgment in favor of Baugher on Appellants'

**17.** In *Holmes,* the defendant engaged in a stock-manipulation scheme that led to the liquidation of two broker-dealers, which were unable to satisfy the claims of their customers. The Securities Investor Protection Corporation ("SIPC") reimbursed the customers and sued the defendant under the federal RICO statute. In addressing the SIPC's argument that it was entitled to recover under RICO because it was subrogated to the rights of the customers who did not purchase the manipulated securities, the *Holmes* court concluded that

the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm

suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims.

*Holmes,* 503 U.S. at 271, 112 S.Ct. 1311. In this case, the trial court's summary judgment orders do not address the issue of proximate cause.

**18.** *See Burk v. Heritage Food Serv. Equip., Inc.,* 737 N.E.2d 803, 812 n. 1 (Ind.Ct.App. 2000) ("[W]hile federal court decisions interpreting Indiana law are persuasive authority, we are not bound by their interpretations.").

RICO claim and remand for further proceedings consistent with this opinion.

### II(A)(3). Baugher—Fraud

■ Appellants alleged that Baugher committed fraud in that he "knew or should have known that the representations regarding the unregistered securities were false at the time they were made" and that Appellants relied on those representations concerning investment in the payphone program and suffered monetary losses as a result. Appellants' App. at 151. "The elements of fraud are: (1) a material misrepresentation of past or existing facts by the party to be charged, (2) which was false, (3) was made with knowledge or reckless ignorance to falsity, (4) was relied upon by the complaining party, and (5) proximately caused the complaining party injury." *Humphries v. Ables*, 789 N.E.2d 1025, 1030 (Ind.Ct.App.2003).

■ Baugher observes that he never had contact with and therefore did not make material misrepresentations to any Appellants. Appellants assert that an agency relationship existed between Baugher and Richman and observe that " '[a] principal is liable for any misrepresentations of his agent undertaken within the scope of the agency, whether or not the principal has knowledge of the fraud.' " Appellants' Br. at 21 (quoting *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind.Ct.App. 2002)). We note, however, that "one who asserts that there was an agency relationship has the burden of proving its existence." *Smith*, 778 N.E.2d at 495. "Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former." *Id.* We have already seen that Jones, not Baugher, recruited Richman for the payphone program and that SPA, not Baugher, paid Richman's commissions. As for Baugher's receipt of override commissions on Richman's sales, Appellants offer nothing more than unsupported assertions that this evidence is sufficient to establish a principal/agent relationship between the two. *See* Appellants' Reply Br. at 15 ("The financial and recruiting relationship is itself evidence of agency."). Under these circumstances, we agree with the trial court that Appellants have failed to establish a genuine issue of material fact as to the existence of an agency relationship between Baugher and Richman and affirm its grant of summary judgment in favor of Baugher on Appellants' fraud claim.[19]

19. Appellants rely on *Bischoff Realty, Inc. v. Ledford*, 562 N.E.2d 1321, 1324 (Ind.Ct.App. 1990), in asserting that "when Baugher and Florida Underwriting, and Jones and Advanced Marketing agreed to recruit subagents for SPA and Alpha, and paid commissions to those agents, they became liable for the agents' misrepresentations." Appellants' Br. at 22. Appellants' argument presupposes, without proving, that the persons recruited by Baugher and Jones were in fact their agents, rather than independent contractors. *Cf. Detrick v. Midwest Pipe & Steel, Inc.*, 598 N.E.2d 1074, 1077 (Ind.Ct.App.1992) ("A principal who controls or has the right to control the physical conduct of his agent in the performance of a service is a master, upon whom liability for the torts of the agent may be imposed. In contrast, the employer of an independent contractor is generally not liable for the torts of that contractor. As a general rule, an independent contractor controls the method and details of his task and is answerable to the principal as to results only.") (citations omitted); Appellants' App. at 668 (Baugher's affidavit: "The sales rep agreement provided that the sales reps acted as an independent contractor, not as an employee [sic], and that ATC had no control over the sales reps['] day to day activities . . . ."); *id.* at 838 (sales representative agreement: "The Representative expressly acknowledges that he/she will be acting as an independent contractor and not as an employee, for all purposes[.]'').

## II(A)(4). Baugher—Theft and Conversion

Because Appellants' theft and conversion claims are premised on the existence of an agency relationship between Baugher and Richman, we affirm the trial court's grant of summary judgment in favor of Baugher on these issues as well.[20]

## II(B). Advanced Insurance Marketing

In its order granting summary judgment in favor of Jones and Advanced Insurance Marketing, the trial court stated,

> As to Advanced Insurance Marketing, the Court finds that Plaintiffs have joined Advanced in this action and have asserted claims against Advanced without designating any evidence at all that Advanced is involved in the transactions. The only evidence in the record concerning Advanced ... is contrary to Plaintiffs' position. The Court finds that it should enter summary judgment in favor of Defendant, Advanced Insurance Marketing, and against Plaintiffs, as to all counts in Plaintiffs' Fourth Amended Complaint.

Appellants' Br. at 34 (finding 5).[21]

Appellants do not specifically address this finding and make no meaningful attempt to distinguish Jones and Advanced Insurance for purposes of the various claims asserted against them. We therefore affirm the trial court's grant of summary judgment in favor of Advanced Insurance Marketing.

## II(C)(1). Jones—Indiana Securities Act Violations [22]

As is the case with Baugher, Appellants and Jones agree that the only potential issues of material fact are (1) whether Jones directly or indirectly controlled Richman and (2) whether Jones, as a broker-dealer, materially aided Richman's conduct for purposes of Indiana Code Section 23-2-1-19(d). In his affidavit, Jones made the following statements:

13. Because of my insurance experience and relationships, I introduced the payphone program to various agents, among them Defendant Joe Richman.

14. At no time prior to this litigation or subsequent, has Mr. Richman been a partner, officer, manager, director, or employee of either myself or Advanced Insurance Marketing.

15. I have no control over the products Mr. Richman offered his clients, nor did Mr. Richman have any contractual commitment to myself or AIM. He simply provided the payphone program as an option to his clients.

16. I received a 2% commission on the sales that defendant Joe Richman made to Linda Keesling, and the Lepharts. The total amount of commissions I received from these sales was approximately $3500.

17. I did not receive the aforementioned commission at the time of the sale but instead usually one to

---

20. The trial court's order states, "Plaintiffs have not presented any legal authority for the proposition that taking money as a commission from an allegedly illegal transaction by someone else makes that person liable for theft or conversion. The Court knows of no such authority, absent a conspiracy or accomplice liability theory, neither of which Plaintiffs are arguing in this count." Appellants' Br. at 43.

21. The trial court did not make a similar finding as to Baugher and Florida Underwriting.

22. Here, we refer only to William Jones.

three weeks after the sale. I did not in any way whatsoever participate in the sales to Keesling, the Lepharts or any other named Plaintiff.

18. Neither did I have control or oversight over any of Joe Richman's presentations, marketing activities or materials that he would provide either prospective customers or his clients. Mr. Richman did not consult with me regarding his business[.]

19. At no time, did I have any expectation of sharing in the profits of any of the activities of Mr. Richman, except for the receipt of override commissions.

Appellants' App. at 861–62. In their response to Jones's summary judgment motion, however, Appellants designated an earlier affidavit by Jones suggesting that he paid Richman's commissions. *See* Appellants' App. at 868 ("Out of the commissions I received, I paid subagents $13,300 in 2000 and $750 in 2001.").[23]

Appellants contend that Jones's recruitment and payment of Richman and his receipt of override commissions on Richman's payphone sales are sufficient to establish a genuine issue of material fact as to whether Jones directly or indirectly controlled Richman as contemplated by the Act. We agree. The fact that Richman was not Jones's employee is certainly not dispositive. *See Hollinger,* 914 F.2d at 1573–74; *see also Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d at 881. We also agree with Appellants that a genuine issue of material fact exists regarding whether Jones, as a broker-dealer, "materially aided" Richman for purposes of the Act. *See Kirchoff,* 703 N.E.2d at 652–53. We therefore reverse the trial court's grant of sum-

mary judgment in favor of Jones on this issue and remand for further proceedings.

### II(C)(2). Jones—RICO Violations

As with Baugher, we conclude that a genuine issue of material fact exists regarding whether Jones proximately caused Appellants' alleged damages. We therefore reverse the trial court's grant of summary judgment in favor of Jones on Appellants' RICO claim and remand for further proceedings consistent with this opinion.

### II(C)(3). Jones—Fraud

■ With respect to fraud, Jones advances the same argument as Baugher: namely, that he never had contact with and therefore did not make material misrepresentations to any Appellants. As for whether Jones may be liable under an agency theory, the designated evidence most favorable to Appellants, the non-movants, indicates that Jones recruited Richman for the payphone program, received override commissions on Richman's sales, and paid at least some of Richman's commissions. Once again, Appellants offer nothing more than unsupported assertions that this evidence is sufficient to establish a principal/agent relationship between Jones and Richman. We therefore affirm the trial court's grant of summary judgment in favor of Jones on this issue.

### II(C)(4). Jones—Theft and Conversion

Because Appellants' theft and conversion claims are also based on an agency theory of liability, we affirm the trial court's grant of summary judgment in favor of Jones.

### II(D). Beegle—RICO Violations

■ Beegle sold payphones to Indiana investors, but it is undisputed that he did

---

**23.** Also, as mentioned above, Richman's excluded affidavit states that Jones paid at least

some of his commissions. *See* Appellant's App. at 559.

not sell to any Appellants. In this instance, we must conclude as a matter of law that Beegle did not proximately cause Appellants' alleged damages by selling payphones to other investors. There is simply no direct relation between Beegle's activities and Appellants' alleged damages. *Cf. Raybestos Prods. Co.*, 54 F.3d at 1243. We therefore affirm the trial court's grant of summary judgment in Beegle's favor.

### II(E). Bucholtz—RICO Violations

For the same reason, we affirm the trial court's grant of summary judgment in Bucholtz's favor.[24]

### II(F). Summary

We affirm the trial court's entry of summary judgment in favor of Baugher and Jones on Appellants' fraud, theft, and conversion claims and in favor of Beegle and Bucholtz on Appellants' RICO claims. We reverse the trial court's grant of summary judgment in favor of Baugher and Jones on Appellants' securities and RICO claims and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

KIRSCH, C.J., and BAILEY, J., concur.

---

24. Consequently, we deny as moot Bucholtz's motion to strike portions of Appellants' brief.